## STERLING NATIONAL BANK AND TRUST CO. OF NEW YORK, Plaintiff-Appellee,

### v.

## FIDELITY MORTGAGE INVESTORS, Defendant-Appellant.

### No. 58, Docket 74–1432.

United States Court of Appeals, Second Circuit.

Argued Oct. 22, 1974.

Decided Jan. 9, 1975.

Harry Gurahian, New York City, for plaintiff-appellee.

Michael J. Murphy, New York City (Lord, Day & Lord, R. Scott Greathead, New York City, of counsel), for defendant-appellant.

Before MOORE, OAKES and TIMBERS, Circuit Judges.

MOORE, Circuit Judge:

This case is an action brought by plaintiff-appellee Sterling National Bank and Trust Co. of New York ("Sterling") against defendant-appellant Fidelity Mortgage Investors ("Fidelity") to recover on a $2,000,000 promissory note dated August 17, 1973 and payable on November 7, 1973. The suit was commenced in the New York Supreme Court but removed to federal court on diversity grounds. The appeal is from an opinion and judgment of the United States District Court for the Southern District of New York denying Fidelity's motion to dismiss for lack of *in personam* jurisdiction and granting Sterling's motion for summary judgment. Since a determination that the district court erred in finding that it had personal jurisdiction over Fidelity would obviate consideration of the merits, we shall consider the jurisdictional issue first.

I.

The sole jurisdictional question is whether, with respect to the promissory

note, Fidelity transacted any business in New York so as to bring it within the reach of New York's long-arm statute, NYCPLR § 302(a)1 (McKinney's 1972), which provides in relevant part:

(a) *Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, . . . who in person or through an agent:

1. transacts any business within the state; . . .

The facts in this regard are undisputed.

Sterling is a bank organized under the laws of the United States, having its principal place of business in New York City. Fidelity is an unincorporated business trust organized under the laws of Massachusetts with its principal place of business in Boston. Fidelity has no office in New York. The business relationship between the parties commenced on March 2, 1972 when a Sterling representative in New York telephoned Kerry B. Fitzpatrick, Financial Vice President of Fidelity, stationed in Jacksonville, Florida, about the possibility of Fidelity having a line of credit at Sterling. In a subsequent telephone conversation on March 13 it was agreed that, subject to the approval of the bank executive committee, Sterling would extend a line of credit for $1,000,000. Fidelity in return would keep compensating balances of 10% of the line of credit and an additional 10% of actual borrowings in a non-interest bearing account at Sterling. Sterling's executive committee did not act on the line of credit immediately, and on March 29, 1972, Fitzpatrick, who was in New York City on unrelated business, responded to an earlier invitation and dropped by Sterling's office to get acquainted with some of the employees there. No negotiations took place during the visit, although someone from Sterling did mention that the executive committee would pass on the line of credit the following day.

The $1,000,000 line of credit was approved, and on April 6, 1972 Fidelity opened an account at Sterling containing the requisite $100,000 compensating balance. Some borrowing by Fidelity occurred thereafter, and on March 1, 1973 by mutual agreement the line of credit was increased to $2,000,000. Fitzpatrick was informed of the favorable action on the increase by Sterling's executive committee when Sterling representatives dropped by a public meeting of Fidelity shareholders in New York City. This visit by Sterling representatives had not been arranged by Fitzpatrick, and other than the social call described earlier, it was the only time when he met in New York with people from Sterling. Balances in Fidelity's account were increased to compensate for the addition to the line of credit, and for a time Fidelity borrowed to the full extent of the line. On June 12, 1973, however, all debt owing from Fidelity to Sterling was paid, and the situation between the parties remained in this state for about two months.

Discussions concerning the $2,000,000 note here at issue began on August 14, 1973 when Fitzpatrick, while in Florida, received a call from Sterling requesting that Fidelity "draw down the entire line," that is, borrow $2,000,000. As was customary, a $200,000 compensating balance would be left in a non-interest bearing account at Sterling. Fitzpatrick agreed, and his office immediately prepared the note in question and transmitted it to New York via mail. The note by its terms made the $2,000,000 face amount payable on November 7, 1973 at Sterling's office in New York. The note was discounted at a rate of 9¼%, and the discount amount ($42,138.89) deducted from the proceeds, leaving net proceeds to Fidelity of $1,957,861.11. This amount was first credited to Fidelity's account at Sterling, and then pursuant to Fidelity's direction $1,757,861.11 (net proceeds less the $200,000 compensating balance) was bankwired to Morgan Guaranty Trust Company in New York for credit to Fidelity's account there.

Whether the foregoing acts by Fidelity are sufficient to constitute the transac-

tion of business in New York is a close question under any circumstances, and the inquiry is made more acute by the necessity of a federal tribunal having to predict what the New York courts would do in the same circumstances. American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corporation, 439 F.2d 428, 431 (2d Cir. 1971). We believe, however, that the district court was correct in exercising jurisdiction over Fidelity.

The proper inquiry in a case such as this is "whether looking at 'the totality of the defendant's activities within the forum', purposeful acts have been performed in New York by the foreign corporation in relation to the contract, 'albeit preliminary or subsequent to its execution.'" Galgay v. Bulletin Company, Inc., 504 F.2d 1062, 1064 (2d Cir. 1974), quoting Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457 & n. 5, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75 (1965), cert. denied sub nom. Estwing Manufacturing Co., Inc. v. Singer, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). Relating this standard to the specific circumstances of this case, there is first the fact that the note, although prepared and executed by Fidelity in Florida, was expressly made payable in New York. Secondly, with respect to the making of the loan, the funds were not wired to Fidelity in Boston or Florida but first credited to Fidelity's account at Sterling. Fidelity then directed that they be transferred by Sterling to another bank in New York. As a direct condition of the loan, Fidelity kept a compensating balance of $200,000 in an account at Sterling.[1] Finally, on one occasion a representative of Fidelity voluntarily visited an office of Sterling

in New York.[2] These were all purposeful acts done by the defendant in connection with this promissory note.

Fidelity stresses that the New York courts have expressly held that the mere fact that a loan may be payable in New York does not render a non-resident borrower amenable to suit within the state. Hubbard, Westervelt & Mottelay, Inc. v. Harsh Building Co., 28 A.D.2d 295, 284 N.Y.S.2d 879 (1st Dept. 1967); Wirth v. Prenyl, S. A., 29 A.D.2d 373, 288 N.Y.S.2d 377 (1st Dept. 1968). But see G. Benedict Corp. v. Epstein, 47 Misc.2d 316, 262 N.Y.S.2d 726 (S.Ct. Albany Cty. 1965).[3] Nor, Fidelity argues, is a brief presence in New York in the form of a short visit to Sterling's office sufficient to constitute the transaction of business. Bankers Commercial Corp. v. Alto, Inc., 30 A.D.2d 517, 289 N.Y.S.2d 993 (1st Dept. 1968); see McKee Electric Co. v. Rauland-Borg Corp., 20 N.Y.2d 377, 382, 283 N.Y.S.2d 34, 37, 229 N.E.2d 604, 607 (1967).

We do not dispute these propositions, but the failure of the defendant to do a single act which might have by itself subjected Fidelity to suit in New York is not dispositive. Under Longines, supra, it is the totality of a defendant's acts which is important. Furthermore, this is not a case in which the sole connection between a payor on a promissory note and New York is that the note is payable there. Not only where the borrowed funds first credited to Fidelity's account in New York and then at Fidelity's direction transferred to another New York bank, but they were also evidenced by substantial compensating balances in a New York account. The compensating balances were clearly not

---

1. Total balances were of course required to be $400,000—$200,000 for the line of credit and $200,000 for actual borrowings.

2. Fidelity would characterize the visit as social, but there can be no doubt that it was prompted by the existence of a budding business relationship. And although the visit took place well before the execution of the note involved in this case, it related directly to the establishment of Fidelity's line of credit at Sterling and thus facilitated the subsequent loan agreement.

3. We are not unmindful of the fact that Epstein has been cited by the Appellate Division, First Department, as "not supported by the weight of authority." Hubbard, Westervelt & Mottelay, Inc. v. Harsh Building Co., 28 A.D.2d 295, 298, 284 N.Y.S.2d 879, 882 (1st Dept. 1967). However, the New York Court of Appeals has more recently cited Epstein with apparent approval. Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506, 508 (1970).

merely an accommodation to the lender, as Fidelity would have us believe, but an important part of the bargain. The situation is analogous to one where a loan is made by a bank to allow a non-resident to purchase stock in New York and then secured by the retention of the stock as collateral by the bank. *See Irving Trust Co. v. Smith,* 349 F.Supp. 146 (S.D.N.Y. 1972).

These facts show sufficient purposeful activitiy in New York by Fidelity to constitute the transaction of business within the meaning of Section 302(a)1. Although the loan was first solicited by Sterling and the note executed in Florida, the transaction in its entirety had close connections with New York. Fidelity was not only fully aware of these contacts but also instrumental in creating them.

## II.

Turning then to the merits of the case, Fidelity does not deny the existence of the obligation but argues that it has been discharged by fraudulent material alteration made on the note. This defense was not remotely available to Fidelity at the time the action was filed, and to understand this contention, a brief description of the course of the proceedings is required.

Sterling commenced this action in the Supreme Court of the State of New York on December 10, 1973 by service of a summons and notice of motion for summary judgment, as permitted by NYCPLR § 3213 (McKinney's 1970) in actions on instruments for payment of money only. Fidelity removed the action to federal district court on January 9, 1974, and on January 17 Sterling made an ex parte application to the clerk of the district court for a default judgment on the ground that Fidelity had not responded within the time permitted by the Federal Rules of Civil Procedure. In addition to the principal amount owing on the note, Sterling requested interest of 9¼% (the rate at which the note had been discounted) from November 7, 1973, the date of maturity, to January 17, 1974, the date of the application. The clerk entered a default judgment of this effect.

Upon receiving notice that a default judgment had been entered against it, Fidelity, through its attorneys, applied by order to show cause to have the default judgment set aside. In substance, Fidelity argued that it had complied with the requirement of the Federal Rules. Because of the large sum of money at stake, and without deciding the merits of Fidelity's argument, Judge Frankel did reopen the judgment. He ordered Fidelity to treat Sterling's motion for summary judgment originally filed in state court as an initial pleading and to respond to it. Fidelity's answer then interposed the defense of fraudulent material alteration (in addition to the jurisdictional point already discussed), a theory which was repeated by Fidelity in opposition to Sterling's ensuing motion for summary judgment.

Fidelity's asserted defense has its roots in a notation "9¼" penciled on the face of the note. The notation was concededly not on the note when originally executed, and according to Fidelity was used to represent to the clerk of the district court that Sterling was entitled to post maturity interest at the rate of 9¼%. In fact, Fidelity argues, there was no agreement between the parties with respect to post-maturity interest, and under those circumstances the proper post-maturity rate was 6%, as provided by statute.[4] And as used to obligate Fideli-

---

4. Uniform Commercial Code § 3–122(4) (McKinney's 1964) provides:

(4) Unless an instrument provides otherwise, interest runs at the rate provided by law for a judgment

(b) . . . from the date of accrual of the cause of action.

NYCLPR §§ 5003, 5004 (McKinney's 1963;

Supp. 1974–75) provide that the interest rate on judgments is 6%. There is no New York decision construing UCC § 3–122(4), although prior case law indicates that interest after maturity runs at the legal rate even though the pre-maturity rate prescribed by the instrument may be different. *Metropolitan Savings Bank v. Tuttle,* 290 N.Y. 497, 49 N.E.2d 983 (1943).

ty to pay a higher rate of interest than would have otherwise been required by the terms of the note the "9¼" became a material alteration.[5] Any material alteration, if fraudulently made, operates to discharge the obligation,[6] and Fidelity argues that there is at least a factual issue over whether the requisite fraudulent intent existed.

We are mindful that as a general proposition summary judgment is inappropriate if issues of motive, intent and other subjective feelings are involved. Empire Electronics Co. v. United States, 311 F.2d 175, 180 (2d Cir. 1962); Cali v. Eastern Airlines, Inc., 442 F.2d 65, 71 (2d Cir. 1971). Furthermore, we are cognizant of the duty to draw all reasonable inferences in favor of the party against whom summary judgment is sought. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). But F.R.C.P. 56(c) permits summary judgment when there is no "genuine issue as to any material fact", and this is a case in which only one inference—the utter absence of any sign of fraudulent intent—can reasonably be drawn from the facts. It is obvious that the "9¼" notation was made on the note by personnel in the Sterling's loan department to record the rate at which the note was discounted. Such a notation was in accordance with standard bank practices. (Joint Appendix 86a–87a). And there was no deviousness in in trying to collect post-maturity interest at the rate of 9¼%. Nor could there have been, for Sterling was fully aware the Fidelity would learn of the judgment either through notification by the clerk or through attempted execution. Any attempted deception would then have been fully disclosed and rendered totally unavailing. The application for default judgment was made upon the belief that Sterling was legally

entitled to interest at the same rate at which the note was discounted. Whether or not this belief was mistaken—a question we do not decide—it was surely not wholly without reasonable foundation. The only potential factual issue in this case was the proper rate of post-maturity interest. That question was resolved by Sterling's agreement before the district court to accept 6%. Accordingly, the granting of summary judgment was proper, and the judgment of the district court is therefore affirmed.

Affirmed.

---

5. Uniform Commercial Code § 3–407(1) (McKinney's 1964) provides:

(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect . . . .

Under pre-UCC case law an alteration of a note affecting the rate of post-maturity inter-

est is regarded as material. See, e. g., Weyerhauser v. Dun, 100 N.Y. 150, 156, 2 N.E. 274 (1885).

6. Uniform Commercial Code § 3–407(2)(a) (McKinney's 1964).