**Harvey S. MOSER, Plaintiff,**

v.

**Bill BOATMAN and Ellen Boatman, Defendants.**

**No. 74 C 1471.**

United States District Court, E. D. New York.

April 17, 1975.

Jesse A. Falzone, Brooklyn, N. Y., for plaintiff.

Bresler, Kallman, Hackmyer & Walzer, New York City, for defendants.

OPINION and ORDER

PLATT, District Judge.

In this diversity action for breach of contract and conversion, defendants, citizens of Ohio move pursuant to Rule 12(b)(2) and (5) of the Federal Rules of Civil Procedure for dismissal on the ground that this Court lacks *in personam* jurisdiction, and on the related ground that dismissal is mandated by Rule 12(b)(5) because of insufficiency of service of process.

Plaintiff Moser, a citizen of New York, was the owner of a herd of pure bred registered Aberdeen-Angus cattle. His herd was originally maintained at the Black Watch farms.

In or about September 1970 Black Watch Inc. filed Chapter 11 proceedings in the Southern District of New York. At that time, defendants, Bill and Ellen Boatman, mailed a four-page form letter to Moser in New York, outlining, in detail, the services that their Rolling Ridge Ranch could provide. There is no dispute as to this solicitation, but conflicts arose as to the succeeding events where defendants and defendants' alleged agent were present in the State of New York.

Plaintiff's affidavit (Garber) indicates that in October 1970, a meeting took place in the Sheraton Inn at LaGuardia Airport between defendants Bill and Ellen Boatman, Mr. William Brown (the Boatmans' attorney), Mr. Roger Mesecher (the Boatmans' Administrative Assistant) and Harry Garber, attorney for seventeen herd owners, including plaintiff Moser. According to Mr. Garber, terms of an agreement between the herd owners and Boatman were discussed; however, there is no mention of the length or outcome of the meeting. Shortly thereafter, another meeting took place at the same Sheraton Inn. Present was Bill Boatman, along with his ranch office manager, Mr. James Cawley, Mr. Garber and the herd owners. The basic agreement was reached at this meeting except for some subsequent revisions. The contract was then prepared by the Boatmans' attorney in Ohio, forwarded to New York for the herd owners' signatures and was thereafter executed by the Boatmans in Ohio.

The foregoing two occasions were the only instances that the Boatmans were present in New York. However, plaintiff's affidavit refers to three occasions in March, April and May 1971 where an alleged agent for the Boatmans, one John King, was in New York City to discuss a possible assignment of the original agreement to a new corporation, the Forty-one Cattle Company, an Ohio corporation. This assignment agreement was signed by plaintiff on May 24, 1971.

Defendant Bill Boatman's affidavit disputes the Garber description of the two meetings at LaGuardia Airport. According to him, they were "brief meetings" where defendant Boatman merely "outlined the services he could provide." He concludes that all negotiations concerning the agreement occurred in Ohio. Further, he denies plaintiff's allegation that King was his agent, when King made his three visits to New York.

The relevant statute here is New York's so-called "long arm" statute, CPLR Section 302, the pertinent part of which provides that

"§ 302.  Personal jurisdiction by acts of non-domiciliaries

(a) Acts which are the basis of jurisdiction.  As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonndomiciliary, or his executor or administrator, who in person or through an agent:

1.  transacts any business within the state;"

The basis for the New York "long arm" statute was the line of Supreme Court decisions beginning with International Shoe v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).  There the Court established the "minimum contacts" theory for establishing jurisdiction over a foreign corporation.  After this decision it was no longer essential that the foreign corporation "consent" to jurisdiction or be "doing business" within the forum state. Due process "requires only that in order to subject a defendant to a judgment in personam, * * * he have certain minimal contacts with it such that the

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " 326 U.S. at 316, 66 S.Ct. at 158.

*International Shoe* was extended even further in McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) where jurisdiction was allowed over an insurance company with no office or agent in California, which had never solicited business there and whose only contact was the writing of the policy. The *critical* factor was that "the suit was based on a contract which had *substantial connection* with that State." 355 U.S. at 223, 78 S.Ct. at 201 (emphasis added).

However, *McGee* and *International Shoe* must be read in conjunction with the Supreme Court's later and more restrictive view on long arm jurisdiction in Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The Court warned that "it is a mistake to assume that this trend [*International Shoe* and *McGee*] heralds the eventual demise of all restrictions on the personal jurisdictions of state courts." 357 U.S. at 251, 78 S.Ct. at 1238. The Court set forth the test for a reasonable contact as to whether there "be some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1240.

Thus, this Court's task is to determine whether the acts of the Boatmans, and of their alleged agent King, within New York were sufficient to conclude that they "purposefully avail[ed] [themselves] of the privilege of conducting activities within . . . [this] State [New York]" and thereby "invok[ed] the benefits and protections of its laws." The problem is, of course, in evaluating the contacts, in determining what weight should be given to each, and to all of them taken together.

The leading New York case in this area is Longines Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68. There the court sustained jurisdiction on a "totality of contacts" where defendant had numerous contacts with New York, although the contract was not executed here:

> They comprised substantial preliminary negotiations through high-level personnel during a period of some two months; the actual execution of a supplementary contract; the shipment for use here, subject to acceptance following delivery, of two specially designed machines, priced at the not inconsiderable sum of $118,000; and the rendition of services over a period of some three months by two of the appellant's top engineers in supervising the installation and testing of the complex machines. 15 N.Y.2d at 457, 261 N.Y.S.2d at 19, 209 N.E.2d at 75.

However, the court did "not determine whether any one of the foregoing activities would, in and of itself, suffice to meet the statutory standard." 15 N.Y. 2d at 458, 261 N.Y.S.2d at 19, 209 N.E. 2d at 76.

From *Longines Wittnauer* it may be seen that certain factors may be deemed to be important, such as the presence of defendants or defendants' agent in New York. Professor McLaughlin views physical presence as "one of the most concrete manifestations of his [defendants] purposeful activity in New York." McLaughlin, Practice Commentary, McKinney CPLR § 302 (1972) at 74. However, there are other factors that should be considered: Who was present in New York? Was it a minor functionary or a "high-level" officer? What was he doing in New York? Was he engaged in *negotiating* the contract out of which this cause of action arises? If it was negotiation rather than mere discussion, what was the duration? Finally, where was performance to be rendered?

Later cases have clarified the *Longines Wittnauer* factors in cases where the contract negotiations were within New York, and where execution was without the state—the instant fact pat-

tern. In Liquid Carriers Corp. v. American Marine Corp., 375 F.2d 951 (2d Cir. 1967) the court held that substantial preliminary negotiations consisting of five or six meetings over a five day period conducted by high level personnel of defendant without the other *Longines Wittnauer* factors (performance in New York and execution of supplementary agreement) was sufficient to meet the statutory requirements for transaction of business.

As for the duration of negotiations in New York, a more recent opinion of Judge Dooling, ECC Corporation v. Slater Electric, Inc., 336 F.Supp. 148 (E.D. N.Y.1971) indicates that the length of the meeting is no longer critical. There a single meeting of as little as one half hour or up to two hours occurred in New York. However, at this meeting, the Court found that the parties agreed on the essential terms of the agreement. 336 F.Supp. at 151. Another District Court allowed jurisdiction when it found that "the critical part of the negotiations of this contract was conducted in New York." Northland Paper Co. v. Mohawk Table Co., 271 F.Supp. 763 (S. D.N.Y.1967). It should also be noted that in the last case, the defendant's president was only in New York twice, and that each visit was of short duration.

In National Iranian Oil Co. v. Commercial Union Insurance Co. of New York, 363 F.Supp. 129 (S.D.N.Y.1973), the court utilized another approach to sustain jurisdiction. There, the parties' first negotiations were in Iran. They then held a four day negotiating session in New York. Finally, the negotiations were shifted to Washington, D.C., where the contract was signed. The parties, of course, differed as to the N.Y. negotiations, plaintiffs characterizing them as long and extensive and basically culminating in agreement on the essential terms. Defendants denied this. The court did not decide the issue of fact as to whether the essential terms of the agreement had been reached in New York; rather, it sustained jurisdiction because it looked at the history of the negotiations, and concluded that the New York "session represented a turning point at which the parties for the first time reached sufficient agreement to leave little doubt that a final contract would actually be concluded." 363 F. Supp. at 132.

The most recent Second Circuit Court of Appeals opinion dealing with this statute (Sterling National Bank and Trust Co. of New York v. Fidelity Mortgage Investors, 510 F.2d 870 (2d Cir. 1975)) set forth the following standard for this Court to apply:

The proper inquiry in a case such as this is "whether looking at 'the totality of the defendant's activities within the forum', purposeful acts have been performed in New York by the foreign corporation in relation to the contract, 'albeit preliminary or subsequent to its execution.'" Galgay v. Bulletin Company, Inc., 504 F.2d 1062, 1064 (2d Cir. 1974), *quoting* Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc., 15 N.Y.2d 443, 457 & n. 5, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75 (1965), cert. denied sub nom. Estwing Manufacturing Co., Inc. v. Singer, 382 U.S. 905 [86 S.Ct. 241, 15 L.Ed.2d 158] (1965).

■ Applying this standard and the factors previously mentioned, it is clear that defendants Bill and Ellen Boatman have committed purposeful acts within New York, allowing this Court to exercise jurisdiction over them. The Court arrives at this conclusion, mindful of the fact that "[i]n commercial cases the [New York] Court of Appeals has indicated a tendency to expand New York's jurisdiction." Weinstein, Korn, Miller, New York Civil Practice § 302.06a at 3–65 (1974). This determination is made without resolving King's alleged agency on the basis of conflicting affidavits.

Perhaps most important is the fact that the Boatmans were present in New York on at least two occasions. See Hi Fashion Wigs v. Hammond Advertising,

32 N.Y.2d 583, 347 N.Y.S.2d 47, 300 N. E.2d 421 (third party defendant who was in New York on only one occasion *held* to have transacted business here).

In addition, it is undisputed that the Boatmans' presence in New York, was "in connection with the matter in suit." Parke Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 16, 308 N.Y.S.2d 337, 339, 256 N.E.2d 506, 507 (1970), *quoting,* Longines Wittnauer v. Barnes & Reinecke, *supra,* 15 N.Y.2d at 456, 261 N.Y. S.2d 8, 209 N.E.2d 68.

Moreover, this Court concludes that the Boatmans were actively involved in at least preliminary (if not all of the) contractual negotiations in New York, (*Liquid Carriers Corp., supra*) where agreement on at least a number of the essential terms was apparently reached.

These factors are determinative (ECC Corporation v. Slater Electric, Inc., *supra,* 336 F.Supp. at 151) even though the contract may have been formally executed in the State of Ohio. Therefore, it is apparent that personal jurisdiction may properly be exercised over Bill and Ellen Boatman because they have transacted business within New York and their motion must accordingly be denied.

One other point merits brief discussion. Plaintiff also alleged jurisdiction over defendants pursuant to CPLR § 302(a)(3)(ii) (Committing a tortious act without the State causing injury to persons or property within the State). This Court refuses to sustain jurisdiction over the Boatmans under this section of the "long arm" statute.

■ Although the tortious act of converting the cattle occurred in Ohio, it did not cause injury to person or property within the State of New York; rather, the injury was also in the State of Ohio. American Eutectic Weld. Alloys Sales Co., Inc. v. Dytron Alloys Corp., 439 F.2d 428 (2d Cir. 1971); Friedr. Zoellner Corp. v. Tex. Metals Co., 396 F.2d 300 (2d Cir. 1968) (tort of conversion). As Professor McLaughlin has indicated, where "[t]he tort alleged was conversion . . . it would seem that

the tortious act and the tortious injury coalesce." McLaughlin, Practice Commentary, McKinney's CPLR § 302 (1972) at 87.

So ordered.