**WILHELMSHAVEN ACQUISITION CORPORATION, Plaintiff,**

v.

**Jeremy ASHER, Mark Woloshyn, Beta Raffineriegesellschaft Wilhelmshaven mbH, Bulk Oil A.G., Holding Tusculum B.V., and S.A. Louis Dreyfus et CIE, Defendants.**

**No. 91 Civ. 3657 (MGC).**

United States District Court, S.D. New York.

Jan. 15, 1993.

---

Sullivan & Cromwell, New York City, for plaintiff Wilhelmshaven Acquisition Corp.; by John L. Hardiman, Gandolfo V. DiBlasi, Daryl A. Libow, Mitchell C. Stein, Harry A. Olivar, Jr., Lynne M. Glass.

Esanu, Katsky, Korins & Siger, New York City, for defendants Jeremy Asher, Mark Woloshyn, Beta Raffineriegesellschaft Wilhelmshaven mbH, Bulk Oil A.G., and Holding Tusculum B.V.; by David L. Katsky, J. Rachael Hamlet, Liane R. White, Thomas F. Lane.

## OPINION AND ORDER

CEDARBAUM, District Judge.

This diversity action arises out of an alleged agreement dated July 13, 1990 ("the July 13 agreement") between the predecessor in interest of Wilhelmshaven Acquisition Corporation ("WAC")[1] a Delaware corporation and wholly owned subsid-

---

1. For convenience, WAC will be used throughout to refer to both Wilhelmshaven Acquisition Corporation and its predecessor in interest, Hudson Acquisition Corporation.

iary of Goldman Sachs Group, L.P., and two European entities, Beta Raffineriegesellschaft Wilhelmshaven mbH ("Beta") and Bulk Oil A.G. ("Bulk") and two foreign individuals, Jeremy Asher and Mark Woloshyn. WAC claims that in the fall of 1990 defendants Asher and Woloshyn improperly repudiated the July 13 agreement and sought to replace WAC with defendant S.A. Louis Dreyfus et Cie ("Dreyfus") as their partner in the purchase of a German petroleum refinery. The complaint alleges breach of express and implied contract, fraud, unjust enrichment, and tortious interference with contract.

Defendants Asher and Woloshyn, citizens of the United Kingdom who reside either in the United Kingdom or in Switzerland, Beta, a German corporation with its principal place of business in Germany, Bulk, a Swiss corporation with its principal place of business in Switzerland, and Holding Tusculum B.V. ("Tusculum") a Dutch corporation with its principal place of business in the Netherlands (collectively, the "moving defendants") have moved to dismiss the second amended complaint on the ground that the Court lacks personal jurisdiction over them. It is undisputed that none of the moving defendants does business in New York. The sixth defendant, Dreyfus, concedes that it does business in New York, and therefore has not joined in this motion.

At the initial oral argument, I ruled that plaintiff had failed to make a *prima facie* showing of personal jurisdiction over Bulk [2] and Tusculum. Accordingly, those defendants were dismissed from the action. (12/20/91 Tr. at 45.) I also rejected plaintiff's contention that the other three moving defendants had consented to a New York forum, and directed the parties to present evidence on the issue of long-arm jurisdiction under § 302(a)(1) of the New York C.P.L.R. *Wilhelmshaven Acquisition Corp. v. Asher*, No. 91 Civ. 3657, 1992 WL 170671 (S.D.N.Y. July 2, 1992). After an evidentiary hearing, for the reasons discussed below, defendants' motion to dismiss the breach of contract claims is denied, and defendants' motion to dismiss the claims for fraud, unjust enrichment and tortious interference with contract by Asher and Woloshyn is granted.

## FACTS

An evidentiary hearing was held at which plaintiff presented the testimony of three witnesses: Stephen Semlitz, a cohead of oil trading at J. Aron & Co. ("J. Aron"); Rex L. Rowell, a consultant retained to evaluate the capacity of the refinery; and Robert Semmens, an investment banker employed by J. Aron & Co. Defendants presented the testimony of Jeremy Asher. After evaluating the credibility of all of the witnesses and weighing the evidence, including the affidavits and the deposition of Simon Rich, a representative of Dreyfus, I make the following findings.

### The July 13 Agreement

In the spring of 1990, representatives of WAC and Goldman Sachs' commodities trading affiliate, J. Aron, held exploratory discussions with Asher and Woloshyn regarding WAC's participation in the purchase of a petroleum refinery in Wilhelmshaven, Germany. With the exception of one face-to-face meeting at Goldman Sachs' London offices, these preliminary conversations took place by telephone, with the WAC and J. Aron representatives in New York, and Asher and Woloshyn in London. It is not clear who initiated the discussions. According to plaintiff, they "terminated at a very preliminary stage in May 1990." (Hendel Aff. ¶ 4.)

Telephone discussions regarding the refinery resumed in early July 1990. A televideo conference was held after a WAC representative in New York expressed a desire "to see" Asher and Woloshyn. The video images of Asher and Woloshyn and the WAC representatives were transmitted to New York and London, respectively.

---

**2.** Plaintiff concedes that Bulk was a limited party to the July 13 agreement and that Bulk's contacts with the transaction ended on July 13, 1990. (Tr. 12/20/91 at 44.) Therefore, any meetings which occurred after that date can not provide a basis for personal jurisdiction over Bulk.

(Tr. at 28.)[3] Negotiations intensified during the afternoon and evening of July 13 (New York time), because the sellers of the German refinery required a financial commitment from WAC by 7:00 p.m. (midnight German time) on that day, and WAC had to consummate a written contract with Asher and Woloshyn before making such a commitment. By midday, a contract had been drafted by WAC's New York law firm, Sullivan & Cromwell, and faxed to London for review by Asher and Woloshyn. The draft included a provision that the agreement would be governed by New York law and that Asher and Woloshyn agreed to submit to the jurisdiction of the appropriate federal and state courts in New York City. (Hardiman Aff. ¶ 3.) However, this provision was not contained in the agreement Asher and Woloshyn signed. (Woloshyn Aff. ¶ 17.) The agreement required WAC to make an initial payment to Mobil on July 13 and gave WAC an option to purchase a 50% interest in the Beta–Mobil agreement and a 50% interest in the entity which ultimately purchased the refinery. WAC could exercise this option by making three additional payments to Mobil on defendants' behalf. (Tr. at 32.)

*Subsequent Activities Relating to the July 13 Agreement*

Between July 13 and mid-September, there was substantial transatlantic telephone contact and mail correspondence between plaintiff and Asher and Woloshyn. It is uncontested that during this period, representatives from both the New York and London offices of Goldman Sachs and J. Aron attended roughly two dozen meetings in London to discuss the refinery deal with Asher and Woloshyn. On August 12, Asher drove into New York to have dinner with Stephen Semlitz and his wife at their apartment. (Tr. at 41.) Earlier that day, Asher had flown from London to New Jersey for a due diligence visit to Mobil in Princeton.

In the following month, Asher flew to New York to attend a meeting of experts and refinery consultants hired by WAC. (Tr. at 130.) The purpose of this September 14 meeting was to resolve the engineers' disputes regarding the capacity of the refinery, and thus enable WAC to estimate the refinery's gross profit margin. The gross profit margin would be used by WAC to determine whether to proceed with the refinery deal. After the consultants' meeting, Asher met with Stephen Semlitz and Stephen Hendel, a co-head of oil trading at J. Aron, to discuss the qualifications of the person chosen to run the refinery and the title he should be given. (Tr. at 138–39.) Asher then met with Hendel and Robert Semmens to discuss the amount of financial participation that they would offer to El Paso Refining Co., a refinery operator proposed to serve as the operating partner, and to discuss WAC's desire to provide for El Paso's participation by reducing Asher and Woloshyn's equity in the transaction. (*Id.* at 139–42.) Finally, during this same trip to New York Asher met with Simon Rich, a representative of Dreyfus, to discuss the possibility of Dreyfus participating in the refinery transaction. (Tr. at 175–76.)

### DISCUSSION

Personal jurisdiction in a diversity action is determined by the law of the state in which the court sits. *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963). Where an evidentiary hearing has been held, plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *CutCo Industries v. Naughton,* 806 F.2d 361 (2d Cir.1986) (citations omitted).

■ Plaintiff argues that this court has personal jurisdiction over the moving defendants under CPLR § 302(a)(1) which provides that:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state....

A nondomiciliary "transacts business" under CPLR 302(a)(1) when he "purposely

**3.** All citations to "Tr." refer to the transcript of the evidentiary hearing.

avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Id.* at 365 (citations omitted). A single act which by itself would be a transaction of business in New York is not required. It is the totality of the defendant's activities in New York which should be considered. *Sterling Nat'l Bank & Trust Co. v. Fidelity Mortgage Investors,* 510 F.2d 870 (2d Cir.1975). But the transaction of business in New York is not enough to meet the statutory standard. To bottom § 302(a)(1) jurisdiction, the plaintiff's claim must arise from the business transacted. This requires a showing that the cause of action is "sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business, and to subject the defendants to suit in New York." *Hoffritz for Cutlery, Inc. v. Amajac Ltd.,* 763 F.2d 55, 59 (2d Cir.1985) (citations omitted).

In support of § 302(a)(1) jurisdiction, plaintiff points to the extensive telephone, telefax, and mail contact between the parties, both before and after the execution of the July 13 agreement, as well as the meetings Asher attended in New York and defendants' alleged agreement to a New York choice of law provision.

### 1. Telephone, Telefax and Mail Contact

■ Plaintiff argues that defendants transacted business within the meaning of § 302(a)(1) by negotiating the July 13 agreement through correspondence, telephone calls, including a video conference call, and telefax transmissions. Plaintiff contends that the fact that these contacts did not take the form of personal visits into the state is irrelevant for jurisdictional purposes.

It is well established that physical presence in the forum is not a prerequisite for obtaining jurisdiction over nonresidents. *Parke–Bernet Galleries, Inc. v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). It is equally clear that not every telephone call made into the state subjects the caller to long-arm jurisdiction. *Mayes v. Leipziger,* 674 F.2d 178 (2d Cir.

1982); *PaineWebber Inc. v. Westgate Group, Inc.,* 748 F.Supp. 115 (S.D.N.Y. 1990); *Lawrence Wisser & Co. v. Slender You, Inc.,* 695 F.Supp. 1560 (S.D.N.Y.1988).

Generally, telephone and mail contacts do not provide a basis for jurisdiction under CPLR § 302(a)(1) unless the defendant "projected" himself by those means into New York in such a manner that he "purposefully availed himself ... 'of the benefits and protections of its laws.'" *Parke–Bernet Galleries,* 26 N.Y.2d 13, 19, 308 N.Y.S.2d 337, 340–41, 256 N.E.2d 506, 508–09 (1970), quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). In *Parke–Bernet Galleries,* the defendant was found to have projected himself into an art auction in New York City by actively participating in the bidding by telephone. 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970). In *Otterbourg, Steindler, Houston & Rosen, P.C. v. Shreve City Apts., Ltd.,* 147 A.D.2d 327, 543 N.Y.S.2d 978 (1st Dep't 1989), long-arm jurisdiction was based on numerous conferences with the New York attorney whom the defendant had retained to represent its interests in a bankruptcy proceeding in New York, as well as participation by telephone in settlement negotiations with the debtor who had filed an adversary proceeding against it in New York. In both cases, the center of gravity of the business transacted was New York, and the defendants participated by telephone in events taking place in New York.

Plaintiff also cites *CT Chemical (USA), Inc. v. Horizons Internat'l Inc.,* 106 F.R.D. 518 (S.D.N.Y.1985) as an example of a case in which mail and telephone contacts were sufficient to subject the defendant to personal jurisdiction in New York. There, through telephone calls and correspondence, the defendant's representative arranged to make two bulk chemical purchases from a company headquartered in New York. The defendant's representative also attended a post-execution meeting in New York. To the extent that § 302(a)(1) jurisdiction in that case was based on mail and telephone conferences alone, it is contrary to the weight of authority. *Fiedler v. First City Nat'l Bank v. Meredith Organi-*

*zation, Inc.,* No. 85 Civ. 8911, 1986 WL 6003 (S.D.N.Y. May 16, 1986), *aff'd* 807 F.2d 315 (2d Cir.1986); *Technology Products Internat'l, Inc. v. Integrated Electronics, Inc.,* No. 85 Civ. 2111, 1986 WL 2413 (S.D.N.Y. Feb. 19, 1986).

In this action, contract negotiations were simultaneously taking place in New York and London. The center of gravity of the transaction was an oil refinery in Germany. Defendants' correspondence, telephone calls and telefax transmissions did not project them into events taking place in New York.

### 2. Asher's Visits to New York

*August 12 Meeting*

■ Defendants argue that Asher's August 12 dinner meeting at Stephen Semlitz's apartment was a purely social visit, and therefore is irrelevant to the jurisdictional analysis.

Asher flew into New Jersey to attend a meeting at Mobil's offices in Princeton. On the night before the meeting, Asher had dinner with Semlitz and his wife at their apartment in New York. During the evidentiary hearing, Asher testified that no business was discussed at the dinner. (Tr. at 145.) In contrast, Semlitz testified that business was discussed for approximately ten to fifteen minutes, but could not remember any specific details. (Tr. at 82.)

Because few business discussions can be characterized as purely social, *CutCo Industries v. Naughton,* 806 F.2d 361 (2d Cir.1986) (citations omitted), jurisdictional significance can be attached to a "social" visit during which substantive business discussions take place. In *CutCo,* the court determined that the defendant's meeting, while not solely a business encounter, was jurisdictionally relevant because business discussions took place which substantially furthered the parties' business relationship. *Id.* at 367.

The only proof that plaintiffs offer to establish that business discussions took place during this meeting is the fact that Asher submitted vouchers for his carfare to and from Semlitz's apartment for reimbursement as a business expense. (Tr. at 149–50.) Because an evidentiary hearing has been held, it is no longer appropriate to construe disputed facts most favorably to plaintiff. Plaintiff has failed to establish that this meeting was sufficiently business related to carry jurisdictional weight.

*September 13 Meeting*

■ In his deposition, Simon Rich stated that he and Asher met in Dreyfus' New York offices on September 13. At that meeting, Rich expressed an interest in participating in the refinery transaction. Asher responded that "there might be an opportunity for [Dreyfus] to get involved." (PX 69 at 101.) Rich requested that Asher call him if such an opportunity arose. (*Id.*) Asher's notes made after the meeting with Rich describe the meeting:

JBA is in NY, meets Simon Rich. Says "We'll give you a shout if we see an opening." JBA then meets with Roy Korins [of Esanu, Katsky, Korins & Siger]. (PX18 at 000494.)

Defendants concede that Asher and Rich met in New York on September 13, and offer no evidence to contradict Rich's testimony as to what took place at the meeting (Tr. at 175–76.) Thus it is undisputed that Asher and Rich at a meeting in New York discussed the possibility of Dreyfus participating in the refinery transaction. What is the jurisdictional significance of that New York meeting?

Plaintiff contends that the meeting violated paragraph 8 of the July 13 agreement ("the no-shop clause"), and was the beginning of defendants' repudiation of the July 13 agreement. Defendants argue that since plaintiff is not suing for breach of the no-shop clause, plaintiff's cause of action does not arise from the September 13 meeting of Asher and Rich as required by 302(a)(1). The no-shop clause provides that:

(a) None of the [Beta Defendants] shall sell, transfer, assign, dispose of or otherwise divest itself of any interest in the Sales Agreement, the [Refinery] or the [entity which acquires the Refinery] on or prior to the [date that the Refinery is acquired] or the date on which [WAC]

determines not to make an advance pursuant to Section 3, whichever shall first occur; and

(b) Neither the Beta Stockholders [Asher and Woloshyn], or any one thereof, nor Beta nor any of their respective affiliates, officers, employees, counsel, advisors or other representatives shall take any action or enter into any agreement in contemplation of such a divestiture, other than as contemplated by this Agreement. (Second Amended Compl. at 12.)

New York activity which constitutes breach of contract has been held to ground personal jurisdiction under § 302(a)(1). In *Transatlantic Cement, Inc. v. Lambert Freres et Cie,* 448 F.Supp. 816 (S.D.N.Y. 1978) the plaintiff had prepared a market study of the American cement industry, and presented it to the defendant in connection with a proposed joint venture to acquire a cement producer. The parties did not proceed with the joint venture, but the defendant agreed not to attempt independently to enter the American cement industry without compensating plaintiff for use of its study. Later, the defendant conducted negotiations in New York to discuss the purchase of an American cement producer. The court accepted plaintiff's allegation that the negotiations constituted a breach of the parties' agreement, and subjected defendant to jurisdiction based on these negotiations.

This action differs from *Transatlantic Cement* in that the New York discussions with Dreyfus in breach of the no-shop provision is not the breach upon which plaintiff is suing. Plaintiff is suing for defendants' alleged repudiation of the July 13 agreement. Nevertheless, the New York meeting with Dreyfus has jurisdictional significance because of the substantial connection between Asher's discussions with Rich and defendants' repudiation of the July 13 agreement. Asher's meeting with Rich was the first of a series of meetings which enabled defendants to repudiate the agreement without losing the financing necessary to purchase the refinery, and thus made repudiation of the agreement financially feasible. Accordingly, plain-

tiff's breach of contract claims arise from this transaction of business.

Defendants argue that the reasoning in *Xedit Corp. v. Harvel Indus. Corp., Fidelipac,* 456 F.Supp. 725 (S.D.N.Y.1978) establishes that the September 13 meeting is jurisdictionally insignificant. In *Xedit* the plaintiff and the nondomiciliary defendant met for the first time at a trade show in New York and discussed the possibility of the defendant's purchasing plaintiff's goods which were on display. Telephone and mail negotiations followed, in the course of which the defendant allegedly misappropriated trade secrets. The court refused to subject the defendant to jurisdiction in New York based on the meeting because there was no connection between the meeting and the misappropriation except "to the extent that it was a link in the chain of events leading to the claim for which relief [was] sought," *Id.* at 729, what is commonly referred to as a "but for" cause, as distinguished from a proximate cause. In contrast to *Xedit,* defendants' alleged repudiation of the July 13 agreement was directly attributable to the discussion with Dreyfus in New York on September 13. Accordingly, Asher's discussions with Rich are not a mere "link in the chain of events" which led to defendants' repudiation. Because of the substantial connection between the September 13 meeting and defendants' alleged repudiation, this meeting is jurisdictionally significant.

September 14 Meeting

■ On September 14, Asher attended a meeting of engineering consultants during which the capacity of the refinery was discussed. ("the consultants meeting") Later that day, Asher met with Semlitz and Hendel to discuss various other matters including the amount of financial participation in the transaction that the operating partner would be offered.

Plaintiff argues that the consultants' meeting is jurisdictionally relevant because during the meeting important engineering issues were resolved which enabled plaintiff to prepare the economic forecasts it needed to decide whether to exercise the option to invest in the refinery. While

defendants benefited from resolution of these issues, plaintiff does not establish any link between defendants' alleged decision to repudiate the agreement and the matters discussed at this meeting. Because plaintiff has not shown that its claims have any connection with this meeting, it has not established the meeting's jurisdictional significance.

In contrast, the non-technical discussions which occurred later in the day are jurisdictionally relevant because of the role they played in defendants' alleged decision to repudiate the July 13 agreement. During meetings in London the prior week, plaintiff had suggested reducing both its and defendants' interests in the refinery deal from 50% to 45% in order to give El Paso, the proposed operating partner, a 10% interest in the refinery. At the September 14 meeting in New York, Asher objected vehemently to this proposal. (Tr. at 140–41.) Defendants argue that this discussion carries no jurisdictional weight because it was not the purpose for which Asher went to New York, and it did not result in a modification of the agreement.

Plaintiff's insistence on reducing defendants' equity interest in the refinery was a significant factor in defendants' alleged repudiation of the July 13 agreement. In a letter to plaintiff dated September 28, 1980, Woloshyn stated "[i]f you do not confirm today unequivocally that you will do the 50–50 deal, and if we have the opportunity to conclude a deal with another partner which preserves our 50% interest, then we shall do so." (Hardiman Aff., Ex. D.) Although these conversations were not part of the meeting's formal agenda and did not result in a modification of the agreement, it is clear that defendants' alleged repudiation of the agreement arose from these business discussions in New York.

### 3. Choice of Law

■ While a choice of law provision in a contract is not a consent to personal jurisdiction, it is relevant to the determination of whether defendant "transacted business" for § 302(a)(1) purposes. *CutCo,* 806 F.2d 361 (2d Cir.1986) (citations omitted).

However, plaintiff has failed to establish by a preponderance of the evidence that defendants consented to application of New York law.

As evidence of defendants' consent to application of New York law, plaintiff relies on defendants' "express agreement" that the July 13 agreement would be governed by New York law and the fact that defendants attempted to retain a New York attorney on July 13, and later used New York counsel when negotiating with Goldman Sachs in October, 1990.

When Woloshyn was informed over the telephone that the draft agreement contained a New York choice of law provision, he responded "Okay. Once it's done could you please send it simultaneously to us . . ." (Asher Aff., ¶ 13.) Since Woloshyn was not responding to a request for consent to application of New York law, but rather was being informed of the contents of the draft, the most reasonable interpretation of his response is that he used the term "OK" to acknowledge that he understood what had been said.

Defendants' attempt to retain, and the later use, of a New York attorney in connection with the agreement do not establish that defendants agreed to the application of New York law. Because plaintiff has not proved that defendants agreed to the application of New York law, I have not considered the effect of such an agreement in weighing the totality of the circumstances for purposes of personal jurisdiction.

Finally, defendants do not argue, nor do I find, that requiring defendants to defend this suit in New York in any way "offend[s] 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

### CONCLUSION

Plaintiff has shown by a preponderance of the credible evidence that this court has personal jurisdiction over Asher, Woloshyn and Beta with respect to the breach of contract claims against them. Therefore, the motion to dismiss these claims is de-

**116**

nied. As to the remaining claims against Asher, Woloshyn and Beta, plaintiff has made no showing that this court has personal jurisdiction. Therefore, defendants' motion to dismiss these claims is granted.

SO ORDERED.