**PREMIER LENDING SERVICES, INC., Plaintiff,**

v.

**J.L.J. ASSOCIATES, Theresa D'Orsi, John Sitar, and Leonard Sitar, Defendants.**

No. 95 Civ. 8737 (BDP).

United States District Court, S.D. New York.

April 25, 1996.

**14**

Anthony J. DeVincenzo, Rye Brook, NY, for Plaintiff.

Richard L. Zucker, Lasser Hochman Marcus Curyan & Kuskin, Roseland, N.J., for Defendants.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

Plaintiff, Premier Lending Services, ("Premier") brings claims against Defendants J.L.J. Associates, Theresa D'Orsi, John Sitar and Leonard Sitar ("J.L.J.") for breach of contract. Before the Court is Defendants' motion pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss the complaint for lack of personal jurisdiction. An evidentiary hearing was held on April 19, 1996 because the facts relevant to the motion were in sharp conflict. For the reasons set forth, Defendants' motion is granted.

### FACTS

The circumstances out of which this lawsuit arose and the court's findings of fact relevant to disposition of the motion to dismiss are as follows: JLJ Sales Association is a New Jersey Corporation which owns and operates a retail shopping center in Carteret, New Jersey. JLJ is owned and operated by John Sitar and his children Theresa D'Orsi and Leonard Sitar ("Leonard"). In the fall of 1992, Leonard Sitar spoke with his architect Irwin Miller of the firm of Maslow & Miller about his difficulty in finding funds for the refinancing of his shopping center. Miller put Leonard in contact with his son Adam Miller, a mortgage broker, who suggested that JLJ hire Premier Lending Services Inc. ("Premier"). Premier is a New York Corporation with its principal place of business in White Plains, New York. It is owned by Toni DiPietro. Her husband, Amerigo DiPietro ("DiPietro") is its executive Vice President.

According to DiPietro, Adam Miller called DiPietro and told him that "his father had some potential business for him." DiPietro testified that he and Leonard first spoke on the phone in November 1992, and the two began negotiating over the phone, by fax and by mail[1] the terms of the agreement. On March 25, 1993, Leonard signed a letter of intent, a brokerage agreement, in which the defendants promised to pay plaintiff a commission if plaintiff secured a $5,400,000 mortgage for plaintiff's shopping center ("the March Agreement"). The March Agreement provided for a ten year loan term at a maximum rate of 9.75 percent, with a commitment fee of $108,000, two percent of the committed amount. That day, Sitar paid a $5,000 deposit check to Premier. On May 13, 1993, the defendants re-executed the letter of intent ("the May Agreement"). The May Agreement provided that Premier would secure a $5,600,000 loan for defendants. The May Agreement provided for a ten year loan term at a rate of 8.25 to 8.5 percent, with a commitment fee of $140,000, 2.5 percent of the committed amount.[2] Both the March Agreement and the May Agreement include a choice of law provision which states that the parties are to be bound by New York

---

1. At the hearing, Premier offered five letters which had been mailed or faxed from JLJ's New Jersey offices to Premier's White Plains office. Significantly, Premier's lawsuit appears to charge JLJ with breach of a contract executed in March, 1993 and modified in May 1993. The five letters offered into evidence at the hearing were all mailed or transmitted in 1994.

2. Leonard also claims that other terms of the May agreement differed, although this may not be material for the purposes of this motion.

law. Eventually, JLJ procured its mortgage from National Westminster Bank, NJ.[3]

Both parties agree that Leonard visited Premier's offices in White Plains, New York. The parties disagree, however, as to the timing, the substance and number of visits. DiPietro testified that Leonard visited Premier's offices three times, in early March, on March 25 and in early April, before the execution of the final letter of intent. DiPietro's recollection of the substance of these meetings was not completely sharp, but he did insist that he and Leonard negotiated the terms of the agreement at all three meetings. Moreover, DiPietro also testified that Leonard signed the March agreement at Premier's offices at the March 25 meeting. DiPietro at first testified that Leonard sent him the deposit check some time before March 25, but later testified that he could not remember how or when he received the deposit check. Toni DiPietro also testified that she met Leonard the first time that he visited the Premier Offices and that she met him three times after that.

Leonard's testimony, which we credit, sharply contrasted with DiPietro's testimony. Leonard remembered a single short meeting with DiPietro in early May at Premier's Offices. The purpose of the meeting, Leonard testified, was not to negotiate the terms of the agreement, but rather to check on what he and his partners considered to be very slow progress on the loan. Leonard did not recall ever having met Toni DiPietro. Moreover, Leonard was certain that he signed both agreements at JLJ's offices in New Jersey.

On September 12, 1995, Defendants were served with a complaint Premier had filed in Westchester County Supreme Court based on Defendant's alleged breach of the May Agreement. On October 12, 1995, Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441.

---

3. According to the complaint, on May 9, 1993, NatWest Bank made a loan to Defendants in accordance with the terms and conditions of the May Agreement.

4. In the absence of an evidentiary hearing, plaintiff need only make a prima facie showing of

## DISCUSSION

In diversity actions, the reach of the Court's personal jurisdiction is determined by New York law. *Arrowsmith v. United Press International,* 320 F.2d 219 (2d Cir. 1963). Where an evidentiary hearing has been held, plaintiff bears the burden of establishing personal jurisdiction by a preponderance of the evidence. *CutCo Industries v. Naughton,* 806 F.2d 361 (2d Cir.1986) (citations omitted).[4]

Premier asserts that jurisdiction is proper under the "transaction of business" provision of the New York long-arm statute. CPLR § 302(a)(1). This section provides that a court may exercise personal jurisdiction over a nondomiciliary who in person "or through an agent transacts any business within the state "provided that there is some articulable nexus between the business transacted and the [claim]" *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983).

Although the test for transacting business under § 302(a)(1) in contract actions can be somewhat imprecise, the underlying question is whether the defendant has performed purposeful acts in New York in relation to the contract. *CutCo Industries,* 806 F.2d at 365; *A.C.K. Sports v. Doug Wilson Enterprises,* 661 F.Supp. 386, 389 (S.D.N.Y. 1987). Moreover, the transacting business test has been interpreted to require a certain quality rather than a specific quantity of contacts with New York. *International Customs Assoc. v. Ford Motor Company,* 893 F.Supp. 1251, 1258 (S.D.N.Y.1995) (citations omitted). Whether or not the contacts are of the appropriate nature must be determined by an analysis of the totality of the circumstances. *United States Theatre Corp. v. Gunwyn/Lansburgh,* 825 F.Supp. 594, 596 (S.D.N.Y.1993) (citations omitted).

The New York Court of Appeals has held that a single transaction of business in New York, out of which the claim has

jurisdiction over the defendant through pleadings and affidavits. See *CutCo,* 806 F.2d at 364. In the present case, however, plaintiff's and defendants' written submissions were in such sharp dispute that we found it necessary to hold a hearing at this time.

arisen, may be sufficient for long arm jurisdiction under CPLR § 302(a)(1). See *Catsimatidis v. Innovative Travel Group,* 650 F.Supp. 748, 751 (S.D.N.Y.1986); *Interface Biomedical Laboratories v. Axiom Medical,* 600 F.Supp. 731 (E.D.N.Y.1985) (citing *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75 (1965), *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965) ). Any contract negotiations which indicate a purposeful invocation of the laws of New York State are transactions of business for purposes of New York's long arm statute. *Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 955–56 (2d Cir.1967). It does not matter whether the negotiations are preliminary, or whether the contract is executed in New York, or whether performance is contemplated for New York. *Moser v. Boatman,* 392 F.Supp. 270, 273 (E.D.N.Y. 1975). DiPietro asserts that the agreement at issue in this case was the result of negotiations from defendants' telephone calls, defendants' visit, and the earlier, almost identical agreement that was executed in New York.

■■■ Generally, telephone, fax and mail between an out-of-state defendant and a New York party in the course of contract negotiations will not confer jurisdiction unless the defendant used communications with New York as a means of projecting himself into the "local commerce". See *Fiedler v. First City National Bank of Houston,* 807 F.2d 315, 317 (2d Cir.1986). In *Wilhelmshaven Acquisition Corporation v. Asher,* 810 F.Supp. 108 (S.D.N.Y.1993), a New York plaintiff sued a British defendant for breach of a contract to purchase a German Oil refinery. The court found that although the parties had negotiated their agreement largely by mail and telephone, these contacts were insufficient in light of the fact that the transaction revolved around an oil refinery in Germany. *Wilhelmshaven,* 810 F.Supp. at 113. See also *Vardinoyannis v. Encyclopedia Britannica, Inc.,* 1990 WL 124338 *4 (S.D.N.Y.

1990) (defendant's business-related telephone calls and letters to New York were not designed to avail him of the forum's protections as they "were connected with transactions taking place almost entirely in Greece"); *L.F. Rothschild, Unterberg, Towbin v. McTamney,* 89 A.D.2d 540, 452 N.Y.S.2d 630 (1982), *aff'd,* 59 N.Y.2d 651, 463 N.Y.S.2d 197, 449 N.E.2d 1275 (1983) (telephone conversations resulting in the purchase of stock by the defendant in Pennsylvania to the plaintiff brokerage firm were insufficient to confer personal jurisdiction.) Compare, *Parke–Bernet Galleries v. Franklyn,* 26 N.Y.2d 13, 308 N.Y.S.2d 337, 256 N.E.2d 506 (1970) (defendant projected himself into an art auction in New York City by actively participating in the bidding by telephone); *Otterbourg, Steindler, Houston & Rosen, P.C. v. Shreve City Apartments,* 147 A.D.2d 327, 543 N.Y.S.2d 978 (1st Dept.1989) (long-arm jurisdiction found where defendant called New York attorney on several occasions to represent its interests in a bankruptcy proceeding as well as participation by telephone in settlement negotiations in an adversary proceeding). In the present case, plaintiff has failed to prove by a preponderance of the evidence that defendants' mail, phone and fax contacts with New York concerning a mortgage from a New Jersey bank for a New Jersey business rise to the level of purposeful availment of New York laws.

As for the March meeting, Premier asserts that the negotiations were substantial whereas defendants assert that the meeting was inconsequential. Jurisdictional significance can be attached to a "social" visit during which substantive business discussions took place which substantially furthered the parties' business relationship. *CutCo,* 806 F.2d at 367.[5] In the present case, plaintiff has failed to prove that the meeting in Premier's office substantially furthered its relationship with JLJ. While it is true that the location of a meeting where terms of an allegedly breached contract are negotiated carries jur-

---

**5.** See *Wilhelmshaven,* 810 F.Supp. at 112 (finding no jurisdictional significance where plaintiff's only evidence of jurisdiction is that defendant submitted carfare vouchers to and from plaintiff's apartment as a business expense but ultimately finding jurisdiction proper over non domiciliaries who allegedly breached contract where substantial provisions of contract were negotiated in New York, even though specific provisions which gave rise to alleged breach were not discussed in New York).

isdictional significance, see *Wilhelmshaven,* 810 F.Supp. at 114, this is not the case here. According to Leonard, whose testimony we credit, the meeting which essentially consisted of a brief progress report, took place after the execution of the March Agreement, and thus the visit has only slight relevance for jurisdictional purposes. See *CutCo,* 806 F.2d at 368 ("attempts to adjust a dispute as to performance of a contract or to discuss differences under an existing contract have no [jurisdictional] consequences ... attempts to renegotiate an existing contract do not constitute a CPLR § 302 transaction of business.") (quotations and citations omitted).

■ Premier also asserts that the choice of law provision in the contract subjects defendants to New York jurisdiction. While it is appropriate to give some weight to choice of law provision, see *CutCo Industries,* 806 F.2d at 366–367, a choice of law clause alone is not dispositive. In this case, where the jurisdictional contacts fall far short of the purposeful availment requirement, the choice of law clause simply does carry enough weight for plaintiff to meet its burden. See *International Customs Assocs.,* 893 F.Supp. at 1260–61; *Benjamin Sheridan Corp. v. Benjamin Air Rifle,* 827 F.Supp. 171, 176 (W.D.N.Y.1993). Accordingly, we find that Premier has failed to prove by a preponderance of the evidence a sufficient transaction of business in New York to withstand a motion to dismiss for lack of personal jurisdiction.

## CONCLUSION

Based on the foregoing, Defendant's motion to dismiss is granted.

**SO ORDERED.**