**KAHN LUCAS LANCASTER, INC., Plaintiff,**

v.

**LARK INTERNATIONAL LTD., Defendant.**

**No. 95 CIV. 10506 (DLC).**

United States District Court, S.D. New York.

Feb. 24, 1997.

Andrew L. Goodman, Joseph P. Tucker, Rosner Bresler Goodman & Bucholz, New York City, for Plaintiff.

Peter J. Schmerge, Deborah K. Squiers, Eaton & Van Winkle, New York City, for Defendant.

### OPINION & ORDER

COTE, District Judge:

On December 13, 1995, Kahn Lucas Lancaster, Inc. ("Kahn Lucas"), brought this diversity action against Lark International Ltd. ("Lark") based on two purchase orders whereby Lark agreed to provide Kahn Lucas with agency services with respect to Kahn Lucas's purchase of clothing manufactured in the Philippines for sale to Sears in the United States. Kahn Lucas is suing Lark for breach of contract, breach of warranties, negligence in performing its duties, and breach of fiduciary duty. Lark brings this motion to dismiss pursuant to Rule 12(b)(2) and (6), Fed.R.Civ.P., for lack of personal jurisdiction. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

### Background

*Plaintiff's Complaint*

According to the Complaint, Kahn Lucas is a New York corporation which is in the children's clothing business. Lark is a Hong Kong corporation which acts as an agent in Asia for United States clothing buyers. In early 1995, Kahn Lucas issued two purchase orders to Lark for finished fleece garments to be imported from the Philippines and sold to Sears in the Fall and Winter of 1995. The sales to Sears were firm orders from Sears for retail sale, and the purchase orders explicitly noted that the goods were intended for sale to Sears.

According to the Complaint, in performing its agency services, Lark sub-contracted with Philippine manufactures for the production of the garments, arranged for the shipment of the goods to the United States, and inspected the goods prior to shipment. Ultimately there were several problems with the goods. Some of the garments were defective, some of the shipments contained the wrong colors or sizes, and many of the goods were never delivered or were delivered late.

Because of these problems, Kahn Lucas could not fully meet Sears' order, and Sears charged Kahn Lucas late fees and other costs. Kahn Lucas argues that these difficulties also led to its losing the opportunity to deal with Sears for the 1996 season and may have jeopardized its overall relationship with Sears.

*Jurisdictional Facts*

Through discovery conducted in connection with this motion, the following facts have been developed. As noted above, Lark is a Hong Kong corporation, with registered offices in Hong Kong, and affiliated offices in other cities in Asia. Lark does not have an office in New York, is not registered to do business in New York, and has no employees in New York.

Lark has been a buying agent for Kahn Lucas since 1988, and receives a seven percent commission based on the seller's price. Lark is not a seller or manufacturer. Lark conducts its business from Asia, and that is where it was originally contacted by Kahn Lucas. Lark communicates with Kahn Lucas in New York through telephone, facsimile, and mail, and in face-to-face meetings when Kahn Lucas personnel travel to Asia. Kahn Lucas sent its orders for clothing to Lark's Hong Kong offices; no contracts were received or signed by Lark in New York.

James Shea ("Shea"), Lark's General Merchandise Manager, met with Kahn Lucas in New York in December 1995. Shea reports directly to Lark's owner. Lark believed that the meeting was to discuss Kahn Lucas' claims against the Philippine manufacturers for the defective goods shipped to Sears. Instead, Shea was served with the Summons and Complaint in this action. This was the last of approximately six meetings in New York between Kahn Lucas and Lark personnel between 1993 and 1995. In the prior meetings the representatives of the two companies discussed generally how their business was doing, "what we can do to go forward," clothing lines that would be produced for that particular season, prices and current volume, and Lark's interest in assisting Kahn Lucas with its recently-acquired license from Disney for *Lion King*–related products. In these meetings, however, Shea and Kahn Lucas did not negotiate any particular pur-

chase. Thus, they did not discuss the commission structure, the volume of lines which Kahn Lucas was seeking to purchase in the coming season, or freight costs. The purchase orders on which this action is based contained a New York arbitration clause and a New York choice of law clause.

In 1995, Lark acted as agent for six New York companies in addition to Kahn Lucas, which together accounted for purchases of more than $1 million. Lark's income from shipping goods into New York on behalf of these six companies, based on an average seven percent commission, was $65,727.56. Lark employees visited these companies in addition to visiting Kahn Lucas when they were in New York. Lark is a plaintiff in an unrelated lawsuit in the Southern District of New York.

### Discussion

█ It is well established that on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). The plaintiff's burden depends on the procedural posture of the litigation. Where there has been no discovery, "a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Id.* But where there has been discovery regarding personal jurisdiction, the plaintiff's burden is to make a *prima facie* showing which includes an averment of facts that, if given credit by the ultimate trier of fact, would be sufficient to establish jurisdiction over the defendant. *Id.* at 567.

█ In a diversity case, this Court must apply the personal jurisdiction law of the forum state. *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en

banc). To determine whether personal jurisdiction exists, this Court must engage in a two-part inquiry. First, there must be a basis for personal jurisdiction under New York state law. Second, the exercise of jurisdiction must comport with the requirements of due process. *See Metropolitan Life Ins.*, 84 F.3d at 567.

Because it is clear, and defendants appear to concede, that Lark has sufficient contacts with New York to satisfy the "minimum contacts" test of due process, *see International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), the only issue is whether there is a basis under New York law for this Court to exercise personal jurisdiction over Lark.[1] Plaintiff points to three such bases.

1. *Long-Arm Jurisdiction, CPLR § 302(a)(1)*

Plaintiff argues that this Court has long-arm jurisdiction over Lark pursuant to New York's Civil Practice Law and Rules ("CPLR") § 302(a)(1) (McKinney 1990), which states that a court may exercise personal jurisdiction over an out-of-state defendant if that defendant "transacts any business within the state" and if the cause of action "arises from" those contacts. *See Cut-Co Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986).

█ Taking the second prong of the Section 302(a)(1) test first, the "arising under" requirement, a claim arises out of a party's transaction of business in New York if there is "a substantial nexus" between the transaction of business and the cause of action sued upon. *See, e.g., Agency Rent A Car*, 98 F.3d at 31; *McGowan v. Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 322–23 (1981). The parties do not dispute that this lawsuit arises out of their agency relationship. The issue in contention is whether Lark was sufficiently transacting business so as to be subject to New York jurisdiction.

1. Even absent defendant's apparent concession on the due process issue, I would find that Lark has sufficient "minimum contacts" with New York to justify the exercise of specific personal jurisdiction over it, and that jurisdiction would be reasonable under the factors drawn from *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113–14, 107 S.Ct. 1026, 1032–33, 94 L.Ed.2d 92 (1987). *See Metropolitan Life Ins.*, 84 F.3d at 567–68.

■ In order to meet the "transacting business" element, a plaintiff must show that the defendant "purposefully avail[ed] [itself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *CutCo Indus.*, 806 F.2d at 365 (citation and quotation marks omitted). Courts should examine the totality of defendant's contacts with New York, rather than focus on each isolated event. *Id.*

■ Although a single purposeful act in New York can be sufficient to support jurisdiction, *see Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75 , *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965), the nature and quality of the New York contacts must be examined to determine their significance. *George Reiner & Co. v. Schwartz*, 41 N.Y.2d 648, 394 N.Y.S.2d 844, 847, 363 N.E.2d 551, 553–54 (1977). In judging whether there are sufficient contacts, the New York Court of Appeals has cautioned that

we should not forget that defendants, as a rule, should be subject to suit where they are normally found, that is, at their preeminent headquarters or where they conduct substantial general business activities.

*McKee Elec. Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 38, 229 N.E.2d 604, 607 (1967). Thus, New York's highest court eschewed an interpretation of Section 302 that would find jurisdiction over "every corporation whose officers or sales personnel happen to pass the time of day with a New York customer in New York. . . ." *Id.* at 37, 229 N.E.2d at 607. Consequently, contacts through telephone calls, the mail, and by facsimile, are usually insufficient to confer personal jurisdiction. *See International Customs Assoc., Inc. v. Ford Motor Co.*, 893 F.Supp. 1251, 1261 (S.D.N.Y.1995) (collecting cases). Three cases from the New York Court of Appeals illustrate these principles.

In *George Reiner & Co. v. Schwartz*, the defendant, a Massachusetts resident, travelled to New York to interview for a job with the plaintiff. The parties reached an employment agreement at that New York meeting, and the defendant became plaintiff's salesman for the territory of New England,

which did not include New York. The Court of Appeals found this to be the "clearest sort of case" for Section 302(a)(1), even though the contact amounted to only a one-day visit to New York, because Schwartz was in New York "at the time the contract, establishing a continuing relationship between the parties, was negotiated and made." *George Reiner & Co.*, 394 N.Y.S.2d at 847, 363 N.E.2d at 554.

*Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, involved an appeal of three cases. In the lead case, plaintiff, a New York corporation, sued defendant, a Delaware corporation with a principal place of business in Illinois, based on a contract under which defendant was to manufacture machines for plaintiff's use. Although the contract was not made in New York, the Court found that the activities of the defendant corporation in New York preliminary and subsequent to the execution of the contract sufficient to constitute transacting business within the state. *Longines–Wittnauer*, 261 N.Y.S.2d at 18, 209 N.E.2d at 75. The preliminary negotiations of the contract in New York were "substantial"; two machines were shipped into the state; and two of plaintiff's "top engineers" were in the state for three months to supervise testing of the machines. *Id.* at 19, 209 N.E.2d at 75–76. The Court of Appeals found that it did not need to determine whether each of these contacts alone would be sufficient, since "in combination they more than meet the standard." *Id.*

Another case illustrates the boundaries of the *Longines* holding. In *McKee Elec. Co. v. Rauland–Borg Corp.*, plaintiff was a New York distributor of defendant's sonic equipment. The agreement creating this relationship was accepted in defendant's Chicago headquarters, and although the trial court gave plaintiff the "benefit of the doubt" by finding that the original contact was "made" in New York, the subsequent renewals were clearly made in Illinois. The parties resolved problems via the mail. In 1964, a dispute developed between plaintiff and some of its customers, and in response, defendant sent one of its managers to New York to attempt to meet with the parties to resolve the problems. After these problems were not resolved, defendant terminated its relationship

with plaintiff by letter. The Court of Appeals characterized these contacts as "infinitesimal," *McKee,* 283 N.Y.S.2d at 37, 229 N.E.2d at 606–07, and found no jurisdiction.

■ Based upon these cases and their progeny, in order for meetings in New York which are subsequent to the formation of the contractual relationship to confer jurisdiction, the meetings must be essential to the business relationship or at least substantially advance it. For example, in *Cantor Fitzgerald, L.P. v. Peaslee,* 88 F.3d 152 (2d Cir.1996), the Second Circuit found no jurisdiction over the defendant based on meetings in New York because it was "not alleged that [defendant's] social meetings were *'essential* to the formation or continuance' of any business relationship such that [defendant's] two-day visit should invoke the jurisdiction of the New York courts." *Id.* at 156 (emphasis supplied). Even defendant's prior employment with the New York corporate plaintiff was insufficient since the defendant, who had worked in the plaintiff's Japanese office, only visited New York once while an employee and "did not conduct any *substantial* employment-related activities in New York." *Id.* (emphasis supplied).

Cases where courts have found jurisdiction involve very significant meetings in New York. *See, e.g., CutCo Indus.,* 806 F.2d at 367 (finding jurisdictional significance from meetings which were "instrumental" in defendant's decision to expand business with plaintiff); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57, 59 (2d Cir.1985) (finding jurisdiction where negotiations leading up to franchise agreements occurred in New York, fifty-four meetings in New York during life of agreement at which entire range of business was discussed); *Liquid Carriers Corp. v. American Marine Corp.,* 375 F.2d 951, 955 (2d Cir.1967) (finding sufficient contacts from three New York meetings characterized as "substantial preliminary negotiations" for contracts). Conversely, where there are no substantively significant meetings in New York, courts have found no jurisdiction. *See, e.g., ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici S.P.A.,* 775 F.Supp. 650, 655 (S.D.N.Y.1991) (no jurisdiction where New York meeting did not "substantially advance" the relationship); *Pneuma–Flo Sys., Inc. v. Universal Machinery Corp.,* 454 F.Supp. 858, 866 (S.D.N.Y.1978) (finding no jurisdiction where defendant's high-level officers made several trips to New York to discuss finding new clients, market conditions, and trade prospects, since such meetings were "not essential to the ongoing relationship of the parties.").

■ I find that the six meetings between Shea and Kahn Lucas over three years were not significant enough to confer personal jurisdiction over Lark. The meetings were simply not essential to the continuance or development of the relationship between Kahn Lucas and Lark; they are more properly characterized as courtesy calls common in business dealings.[2] Moreover, these meetings played no role in the formation of the relationship between the parties. This relationship began with Kahn Lucas's representatives meeting with Lark in Asia—thus the most important part of the negotiations were conducted there. The maintenance of the relationship was conducted largely through correspondence and over the phone with Lark in Hong Kong and Kahn Lucas in New York. Lark performed its obligations under the contract entirely in Asia. Lark was not in New York when the purchase orders were negotiated or issued. Lark did not ship the goods into New York. Finally, the December 1995 meeting between Shea and Kahn Lucas, which was intended to discuss the current dispute, is of no jurisdictional significance. *See CutCo Indus.,* 806 F.2d at 368.

■ The existence of a choice of law clause, while not sufficient standing alone to confer personal jurisdiction, is "relevant in determining whether a nondomiciliary trans-

---

2. The cases on which plaintiff relies do not suggest a different result. The New York meetings in *Interface Biomedical Labs. Corp. v. Axiom Med., Inc.,* 600 F.Supp. 731, 736 (E.D.N.Y.1985), significantly advanced the formation of a contract. In *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co.,* 782 F.Supp. 763, 770–71 (W.D.N.Y.1991), the defendant shipped its products into New York state, applied to New York State authorities for the permits necessary to sell the products in the state, and participated in the marketing of its products in the state.

acted business' for CPLR 302(a)(1) purposes." *Id.* at 367. Here, however, the choice of law clause is not sufficient to tip the balance in favor of finding jurisdiction.

Plaintiff also points to meetings in New York between Lark employees and six other customers, and the fact that Lark is maintaining an unrelated lawsuit in the Southern District of New York. Insofar as these contacts are not related in any way to the underlying cause of action, they are irrelevant for purposes of determining whether there is personal jurisdiction under CPLR § 302(a)(1) because the lawsuit does not "arise from" these contacts. *See McGowan,* 437 N.Y.S.2d at 645, 419 N.E.2d at 322–23.

### 2. *Transient Jurisdiction*

██ As another basis under New York law for personal jurisdiction over Lark, plaintiff argues that because Shea was served personally in New York, this Court has "transient" jurisdiction over Lark. In *Burnham v. Superior Court,* 495 U.S. 604, 622, 110 S.Ct. 2105, 2116–17, 109 L.Ed.2d 631 (1990), a plurality of the Supreme Court recently reaffirmed the ancient principle that transient jurisdiction—where an individual defendant is served while temporarily present in the state—allows suit even on matters unrelated to the defendant's presence in the state. *Burnham* did not specifically address whether transient jurisdiction is applicable to a corporation, as opposed to an individual, although the plurality did remark that corporations "have never fitted comfortably in a jurisdictional regime based primarily upon

'de facto power over the defendant's person.'" *Id.* at 610 n. 1, 110 S.Ct. at 2110 n. 1 (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158).[3] I need not reach the issue of whether transient jurisdiction over corporations comports with due process, since I hold that New York law does not provide for transient jurisdiction to be had over corporations where the corporation is not continuously and systematically "doing business" in New York.

New York's CPLR does not explicitly provide for transient jurisdiction over either corporations or individuals. Plaintiff cites CPLR § 301 in support of its argument that New York law recognizes transient jurisdiction over corporations. Section 301 states that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." Thus, CPLR § 301 preserves any basis of personal jurisdiction exercised by New York courts prior to the passage of the CPLR in 1962.[4]

Plaintiff argues that prior to the enactment of CPLR § 301, in *Robert Dollar Co. v. Canadian Car & Foundry Co.,* 220 N.Y. 270, 115 N.E. 711 (1917), the New York Court of Appeals extended New York personal jurisdiction over corporations to the limits of due process. Accordingly, plaintiff argues, that after *International Shoe* and *Burnham,* all that is required to establish jurisdiction over a foreign corporation in New York is (1) service on a corporate managing agent in New York pursuant to CPLR § 311; and (2) minimum contacts sufficient to establish due process.[5]

---

**3.** Plaintiff cites *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), in support of the proposition that transient jurisdiction is constitutional when applied to foreign corporations. In *Perkins,* however, the Court found that the foreign corporation was engaged in "continuous and systematic" business in Ohio, *id.* at 447, 72 S.Ct. at 419, and thus the Court was not presented with the issue of whether due process allowed transient jurisdiction over a corporation where such extensive contacts were lacking.

**4.** Today, CPLR § 301 is used primarily to subject foreign corporations to general jurisdiction—that is, jurisdiction over any matter, even those not related to the corporation's contacts with the forum state—where they are found to be "doing business," "not occasionally or casually, but with

a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915 (1917) (noting that "[u]nless a foreign corporation is engaged in business within the state, it is not brought within the state by the presence of its agents"). *See also Hoffritz for Cutlery,* 763 F.2d at 57–58; *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762–63 (2d Cir. 1983).

**5.** *Robert Dollar* dealt with the predecessor to CPLR § 311, which provides the method for service of process of foreign corporations. *Robert Dollar* noted that in cases such as *Pope v. Terre Haute Car Mfg. Co.,* 87 N.Y. 137 (1881), the New York Court of Appeals had held that courts in New York could constitutionally assert jurisdiction over foreign corporations based merely on

The New York Court of Appeals has held, however, that pre–1962 New York law, incorporated into current law by CPLR § 301, did not adopt the *International Shoe* test as the test for jurisdiction over foreign corporations. Rather, the pre-CPLR rule for jurisdiction over foreign corporations required that the corporation be "doing business" in New York. In *Simonson v. International Bank*, 14 N.Y.2d 281, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964) (Fuld, J.), the Court of Appeals was faced with the issue of whether the CPLR, newly-enacted in 1962, which established long-arm jurisdiction in New York, could be applied retroactively to a corporation served under the old system. In *Simonson*, a member of the foreign corporation's board of directors was personally served in New York in an action relating to a contract allegedly made by the foreign corporation in New York. The Court held that

> Under our decisional law prior to the adoption of the CPLR, a foreign corporation, not authorized to do business in this State, was held amenable to local suit only if it was engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of its "presence" in this jurisdiction.

*Id.* at 436, 200 N.E.2d at 429. The Court held that "[t]he doing business test was initially dictated by the due process requirements of the Federal Constitution as formerly interpreted by the United States Supreme Court." *Id.* Contrary to plaintiff's arguments, the Court of Appeals made clear that New York law had not expanded along with the contours of due process as interpreted in *International Shoe* and *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

> While those decisions broadly expanded the power of this State to subject foreign corporations and nonresident individuals, not "present" in the forum, to the personal jurisdiction of its courts, the Legislature

took no steps to exercise that power until the enactment of the CPLR. The courts likewise continued to apply the traditional "doing business" test though there were occasional suggestions that that standard might be relaxed in accordance with the later Supreme Court decisions.

*Id.* at 437, 200 N.E.2d at 430. The Court went on to hold that it would be inappropriate to incorporate the *International Shoe* test retroactively into New York law, and essentially upheld the prior "doing business" test.

In sum, between 1945 when *International Shoe* was decided, and 1962, when the CPLR was enacted, New York did not expand its jurisdiction to occupy the expanded area of personal jurisdiction after *International Shoe*. As one commentator has stated, the "classic 'presence' test is still followed in New York, even though, constitutionally, the test may be unnecessarily restrictive of state jurisdictional power." Joseph M. McLaughlin, *Practice Commentaries*, 7B McKinney's Consol. Laws of N.Y. Ann., C301:2, at 9 (McKinney 1990). Plaintiff does not attempt to argue that Lark has sufficient contacts with New York to establish "doing business" under the CPLR § 301 test, and thus there is no jurisdiction based on Kahn Lucas' personally serving Shea in New York.

### 3. *New York Arbitration Clause*

 Finally, Kahn Lucas contends that this Court has jurisdiction over Lark because the purchase orders issued by Kahn Lucas contain a New York arbitration clause. The clause states that

> Any controversy arising out of or relating to this Order ... shall be resolved by arbitration in the City of New York.... The parties consent to the application of the New York or Federal Arbitration Statutes and to the jurisdiction of the Supreme Court of the State of New York, and of the United States District Court of the South-

service of process of an officer temporarily and incidently in New York, even though that corporation was not doing business in New York. *Robert Dollar*, 115 N.E. at 712. The Court recounted that subsequent to cases such as *Pope* the Supreme Court had held that jurisdiction under such circumstances violated due process,

and that therefore the New York courts "yielded to the views of the Supreme Court." *Id.*, 115 N.E. at 713. The Court held that its interpretation of the statute would follow the constitutional rule as articulated by the Supreme Court, *id.*, which at that time required continuous and systematic doing business.

ern District of New York, for all purposes in connection with said arbitration. . . .

In *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir.1977), the Second Circuit held that when a party agrees to arbitrate a dispute in New York, such agreement is deemed consent to the jurisdiction of the courts for purposes relating to enforcing the arbitration agreement. The rationale of this rule, however, means that this Court has jurisdiction over Lark only in support of arbitration.[6]

Plaintiff has not yet moved to compel arbitration, although it has indicated a desire to arbitrate the dispute. The defendant has suggested that it may have defenses to a motion to compel. Since the issue is not yet fully presented to the Court, all that can be said at this time is that the arbitration clause does not give this Court personal jurisdiction over the defendant to litigate the claims in this lawsuit.

### Conclusion

The motion to dismiss for lack of personal jurisdiction is granted. Dismissal of the action is stayed, however, for thirty days to permit the plaintiff to file any motion to compel arbitration. Should such a motion be filed and be opposed, opposition papers will be due thirty days after the motion is filed.

SO ORDERED.

---

6. Plaintiff cites *Philipp Bros. Div. of Engelhard Minerals & Chem. Corp. v. El Salto, S.A.*, 487 F.Supp. 91 (S.D.N.Y.1980), apparently for the proposition that consent to arbitrate in New York is consent to New York jurisdiction for a lawsuit in federal court, irrespective of the existence of an arbitration. But Judge Lasker noted that it is arguable that jurisdiction found to exist in a *Merrill Lynch* type case may evaporate if the plaintiff who has secured jurisdiction against the defendant because of the terms of an arbitration clause unduly delays initiating the arbitration process. *Id.* at 93 n. 2.