Julian MILLER, Plaintiff,

v.

Yannis CALOTYCHOS, Victoria Thompson and iView Multimedia, Ltd., Defendants.

No. 03 Civ. 4273(VM).

United States District Court, S.D. New York.

Jan. 29, 2004.

Richard J.J. Scarola, Scarola, Reavis & Parent, New York City, for Plaintiff.

Toby Michael John Butterfield, Cowan, Debates, Abrahams and Sheppard, L.L.P., New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

In this action, plaintiff Julian Miller ("Miller"), a citizen of the United States and resident of Hawaii, asserts various claims arising out of his computer software business relationship with defendants Yannis Calotychos ("Calotychos"), Victoria Thompson ("Thompson") and iView Multimedia, Ltd. ("iView") (collectively "Defendants"). Calotychos and Thompson, who are married to each other, are citizens and residents of the United Kingdom, and iView is a corporation formed by them in the United Kingdom. Before the Court is Defendants' motion to dismiss Miller's complaint on the ground that the Court lacks personal jurisdiction over Defendants or, alternatively, that New York is not a convenient forum for the litigation of this matter. For the reasons described below the motion is denied.

## I. FACTS [1]

Miller asserts in his complaint that his business contacts with Defendants commenced sometime in 1996. At that time, he came across an internet browser program operated by Calotychos. Miller proposed that he and Calotychos develop a version of the program to market commercially. Communicating primarily through electronic means from Nevada and later Hawaii and England, the parties entered into a licensing arrangement in June 1998 that ultimately led to the incorporation of iView. Miller alleges that under his initial written agreement with Calotychos, Miller was to serve as a distributor of the software, but that the arrangement was subsequently modified, by oral agreement reached between them through discussions by e-mail and the telephone, into a business development partnership in which each was to own 50 percent of the venture. The business was incorporated by Calotychos and Thompson in the United Kingdom in 1998. According to Miller, the underlying dispute arose in part when Calotychos insisted that Thompson be given a substantial equity interest in the corporation. Calotychos and Thompson, denying that any agreement with Miller ever existed granting him an equity share in the company and asserting that they are its sole owners, terminated their relationship with Miller following a meeting among the parties in New York in 2001.

On these pleadings, Miller asserts six claims: breaches of contract and of joint

---

1. The factual recitation below derives from the complaint and other pleadings in this action, as well as the affidavits, declarations, memoranda of law and accompanying exhibits the parties submitted in connection with the instant motion. *See* Affidavit of Julian Miller ("Miller Aff.") dated November 17, 2003; Declaration of Mark Fleming ("Fleming Dec.") dated November 17, 2003; Affida- vit of Yannis Calotychos ("Calotychos Aff.") dated October 3, 2003; Affidavit of Victoria Thompson dated October 3, 2003; Reply Affidavit of Yannis Calotychos dated December 11, 2003; Affidavit of David Rainford dated December 8, 2003. Except where specifically referenced, no further citation will be made to these documents.

venture agreement; conversion of his share of iView profits and their wrongful distribution to Calotychos and Thompson; replevin for his shares of iView stock; and declaratory relief seeking judgments that he owns a 50 percent equity interest in iView and that he is a co-author of three software programs which Miller claims were created in collaboration between him and Calotychos.

The jurisdictional dispute raised by Defendants' motion concerns the extent of the parties' dealings relating to iView business that occurred in New York. Miller claims that during the time of his involvement with the venture, iView's business was largely directed at a customer market and Macintosh program applications industry and licensing partners located in the United States, and that New York was the company's principal target for business development and marketing. Specifically, Miller claims that he first met Calotychos and Thompson at a MacWorld Conference and Exposition, held in New York over six days in July 1999, and that they all attended at the invitation of Adaptec, a new licensee of iView. According to Miller, over several days at this convention he and Calotychos reaffirmed their agreement and solidified their business relationship by collaborating in promoting iView software programs to other companies, working with Adaptec representatives in supporting a new Adaptec product, and together holding themselves out as iView's two principals.

Miller also attests that he and Calotychos and Thompson again engaged in iView business transactions in New York at the 2001 MacWorld conference at which iView rented a booth. During the course of that event, according to Miller, he, Calotychos and Thompson met in New York with the principals of Center for Digital Imaging ("CDI"), a software company based in New York, and initiated a business relationship between CDI and iView. Miller claims that while in New York he also met to discuss iView business with an official of Nikon, and arranged for the sale of iView Software through several retail outlets and for bulk licenses with Conde Nast and Time, Inc., and that he and Calotychos met with representatives of Minolta, Apple Computer, VST, a hardware maker, and with photo journalists, graphic designers and other industry agents.

Miller asserts that after the convention, he, Calotychos and Thompson remained in New York and met for an entire day to continue discussions concerning differences of opinion that had arisen among them relating to the company's ownership and management, specifically the denial by Calotychos and Thompson, implicit in a draft distributorship agreement Thompson had transmitted to Miller prior to the convention, of Miller's claim that he owned a substantial equity interest in iView. This meeting included participation by Mark Fleming, a computer software engineer resident of Canada who worked with Miller and Calotychos as a technical consultant developing programs for iView. (See Fleming Decl. ¶¶ 1–2.) Miller states that he refused to sign the draft distributorship agreement, maintaining that it did not reflect his ownership of an equity share of the company.

Finally, Miller asserts that iView maintains a fully interactive website through which its software products may be directly ordered from New York and that Defendants reserved a booth at the 2003 MacWorld conference but did not attend by reason of the instant litigation.

In support of their motion and responding to Miller's contentions, Defendants assert that they are not now and never were present in New York for jurisdictional purposes; that they did not negotiate, enter

or execute any agreement with Miller in New York; and that they have no offices, agents, bank accounts or other assets, advertising or continuing business relations with any New York company. According to Defendants, Calotychos' written agreement with Miller had no connection with New York, and neither did the oral modification of their contract Miller claims was made in 1998, both allegedly concluded long before the parties' first personal encounter in New York in July 1999. Defendants contend that on the two occasions the parties did meet in New York in 1999 and 2001, their discussions were not substantive, did not involve Miller's ownership interest in iView and were not essential to the formation of the alleged contract or to the advancement of the parties' business relationship, and therefore had no importance for jurisdictional purposes. By Calotychos' account, when Defendants visited New York in 1999, it was only as a stopover at Adaptec's invitation, on their way to business meetings in California. Of the parties' 2001 discussion, Calotychos asserts that it was a "very brief meeting" at which they endeavored to resolve "whether [Miller] was willing to sign the Sales Negotiator and Rep Agreement and, if so, whether we could agree on whether [Miller] should become a shareholder of iView." (Calotychos Aff. ¶ 15.) Calotychos also acknowledges that he visited New York again in September 2001 to meet with Nikon representatives and in 2002 to attend the MacWorld expo, where iView rented a booth.

## II. DISCUSSION

Miller contends that this Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law and Rules ("CPLR") §§ 302(a)(1) and 301. Defendants challenge the application of those provisions to this case and assert that exercise of jurisdiction would also offend the requirements of due process necessary to satisfy constitutional standards. *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Asahi Metal Indus. Co., Ltd. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

### A. STANDARD OF REVIEW

At this stage of the litigation, " 'prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction,' *i.e.,* by making a '*prima facie* showing' of jurisdiction." *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 199 (2d Cir.1990)) (internal citation omitted); *Landoil Res. Corp. v. Alexander & Alexander Services, Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). In reviewing a motion to dismiss, the court assumes that plaintiff's factual allegations are true, construes pleadings and affidavits in the light most favorable to plaintiff and similarly resolves any doubts raised in favor of the plaintiff. *See A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79–80 (2d Cir. 1993); *Hoffritz,* 763 F.2d at 57.

### B. CPLR § 302(a)(1)

█ Under CPLR § 302(a)(1), New York's long-arm statute,

a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state....

N.Y. C.P.L.R. § 302(a)(1) (McKinney 2003). To establish personal jurisdiction under this provision, the plaintiff must demonstrate that the defendant engaged in a purposeful business transaction in or directed to New York and that such contacts within the state had a "substantial relationship" to the claim asserted in the underlying litigation. *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (1988) (noting that CPLR 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted"); *see also McGowan v. Smith,* 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 323 (1981) (requiring a showing under CPLR § 302(a)(1) of "the existence of some articulable nexus between the business transacted and the cause of action sued upon"); *McKee Elec. Co. v. Rauland–Borg Corp.,* 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604, 607 (1967).

■ Defendants contend that the contacts they acknowledge having with Miller in New York in 1999 and 2001 were insufficient to constitute transaction of business for the purposes of CPLR § 302(a)(1). In support of their argument, they rely upon the general proposition articulated in some cases that "a single meeting in New York will rarely provide the basis for jurisdiction pursuant to § 302(a)(1), especially when that meeting does not result in the execution of a contract." *Cooper, Robertson & Partners, LLP v. Vail,* 143 F.Supp.2d 367, 372 (S.D.N.Y.2001). In some of the precedents Defendants cite, the courts declined to exercise jurisdiction where some amount of contract negotiations occurred in New York between the plaintiff and the defendant but no agreement was produced, or where the alleged contract predated New York interactions between the parties that did not substantially advance the business relationship. *See, e.g., Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,* 956 F.Supp. 1131, 1136 (S.D.N.Y.1997), *rev'd on other grounds,* 186 F.3d 210 (2d Cir.1999) (finding that six meetings between the parties over three years were not significant enough to confer jurisdiction over the defendant where the meetings were "not essential to the continuance or development of the relationship" between them, and were more properly characterized as "courtesy calls common in business dealings"); *Kash 'N Gold, Ltd. v. ATSPI, Inc.,* 690 F.Supp. 1160, 1163 (E.D.N.Y.1988) (noting that "where no contract is formed and there is no other activity substantial enough to be deemed the transaction of business, then jurisdiction under C.P.L.R. § 302(a)(1) will not lie.").

Defendants' reliance on this authority is misplaced. First, in each of the preceding cases the contacts, meetings or negotiations in New York that did not result in formation of a contract or substantial advancement of the parties' business relationship constituted the sole basis upon which jurisdiction was being asserted. In *Kash 'N Gold,* for example, a case which Defendants contend appears to be most closely analogous to the action at hand, the New York contacts entailed nothing more than brief negotiating sessions on two occasions that failed to yield an agreement, and the court specifically noted that there was no other meaningful business activity warranting the exercise of jurisdiction. *See id.*

Second, Defendants place undue emphasis on the parties' allegedly brief and unsuccessful meetings in New York separate and apart from the substantial other business interactions between them that Miller

describes. For jurisdictional analysis, Defendants' New York transactions and the parties' dealings cannot be parsed and regarded separately, as Defendants suggest. Rather, their business meetings and transactions in New York must be considered in the context of the totality or combination of all of Defendants' business contacts with New York. *See CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the totality of all defendant's contacts with the forum state must indicate that the exercise of jurisdiction would be proper.") (citing *Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors,* 510 F.2d 870, 874 (2d Cir.1975), and *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68, 75–76 (1965)); *see also GB Mktg. USA, Inc. v. Gerolsteiner Brunnen GmbH & Co.,* 782 F.Supp. 763, 769 (W.D.N.Y.1991) ("[T]he court must consider the quantity and composite quality of the defendant's actions in the aggregate."); *M. Fabrikant & Sons, Inc. v. Adrianne Kahn, Inc.,* 144 A.D.2d 264, 533 N.Y.S.2d 866, 868 (1st Dep't 1988) ("Jurisdiction can be grounded on a combination of seemingly separate events, any one of which, standing alone, would be insufficient to confer jurisdiction.").

Here, reading Miller's allegations in the light most favorable to him, Defendants' New York business contacts and the underlying transactions that Miller alleges amount to much more than two isolated, casual encounters between the parties. Rather, Miller describes considerable interaction between them in New York not only relating to the nature and extent of their business relationship, but combined with contacts and transaction of substantial business activities with other persons arising out of and consistent with the parties' existing contractual arrangement,

whatever it may have been at the time. Pursuant to these dealings, Defendants allegedly held Miller out to other firms as a principal of iView, and benefitted from Miller's work and professional contacts in New York that may have resulted in actual or potential new business valuable to Defendants. That some form of business agreement did exist between them prior to the parties' meetings in New York formed the basis for their joint promotion of iView's products that Miller asserts occurred at the MacWorld conventions in 1999 and 2001 and that may qualify as purposeful acts directed at performance of the parties' agreement in New York. The existing arrangement also served as the foundation for the parties' further discussions concerning the precise nature of their business relationship with respect to the ownership and management of iView, as well as for sufficient aspects of the dispute that gave rise to the claims Miller asserts in this action. *See Clarendon Nat'l Ins. Co. v. Lan,* 152 F.Supp.2d 506, 517 (S.D.N.Y.2001) (noting the relevance for jurisdictional purposes of a meeting in New York to show the contractual relationship between the parties and to demonstrate that defendant "visited New York for the purpose of meeting with parties to an alleged contract regarding the contractual relationship."); *Wilhelmshaven Acquisition Corp. v. Asher,* 810 F.Supp. 108, 113–14 (S.D.N.Y.1993).

Defendants unduly minimize the extent and legal effect of these activities by characterizing their interactions with Miller as brief, isolated, not substantive, and unessential to the parties' business arrangement. Miller, on the other hand, alleges that the parties discussed iView ownership issues during Defendants' 1999 New York visit and that their 2001 meeting on the same subject, rather than a very brief, casual encounter or social affair, lasted

several hours and also involved Fleming. (*See* Miller Aff. ¶ 27; Fleming Dec. ¶ 10.) [2] Moreover, while Defendants dismiss their session with Miller as unimportant to the parties' business arrangement, in fact, accepting Miller's assertions as true for the purposes of this motion, what was at stake in those discussions entailed the ownership of 50 percent of the company—by no means a non-substantive or trivial detail in their relationship. By Defendants' own account of the 2001 meeting, they sought to prevail upon Miller to execute a draft agreement Thompson had earlier transmitted to him that would have resolved Miller's status in the parties' arrangement as only a sales distributor. When Miller declined that proposal, Defendants subsequently ended their business relationship with Miller. Therefore, if Miller's claim is correct that the modified agreement making him an equity owner that he asserts in this action did exist at that time, Defendants' insistence on a substantially different business arrangement at this New York meeting arguably could be regarded as a repudiation of the prior agreement and an offer to enter into a different contractual venture.

An analogous situation occurred in *Wilhelmshaven,* 810 F.Supp. at 114–15. There, the parties held meetings in New York over a two-day period during which they discussed modification of their prior business arrangement, which had been negotiated primarily by telephone and telefax between New York and London, in an attempt by plaintiff to involve another participant in the business transaction, thereby reducing the share of equity interest of both parties. At one of those meetings, defendants allegedly repudiated the parties' agreement after rejecting plaintiff's proposed alteration of the transaction, which had been introduced in the London

discussions the previous week. Defendants argued that the New York meetings carried no jurisdictional significance because those discussions were not the purpose for which their representative was present in New York and did not produce a modification of the agreement. The Court rejected this contention, finding that the New York meetings had jurisdictional relevance because they played a significant role in the defendants' alleged repudiation of the parties' agreement. *See id.* at 115. "Although these conversations were not part of the meeting's formal agenda and did not result in a modification of the agreement, it is clear that defendants' alleged repudiation of the agreement arose from these business discussions in New York." *Id.; see also Clarendon,* 152 F.Supp.2d at 517.

Here, as in *Wilhelmshaven,* a significant issue arises as to whether the parties' New York meetings provided the occasion for or played a substantial role in Defendants' repudiation of the parties' prior business arrangement. Under these circumstances, the Court cannot accept Defendants' characterization of those interactions and their outcomes as non-substantive or not "essential to the business relationship," *Kahn Lucas,* 956 F.Supp. at 1136, or that they bore no substantial connection to the claims asserted in this action.

Defendants also understate the extent of their business transactions in New York that emerges from a fair construction of Miller's pleadings and affidavits. By their own admission, Defendants appeared at three trade conventions in New York in 1999, 2001 and 2002 and held meetings with Miller during two of those visits. On one occasion in 2001 Calotychos engaged in business discussions for several hours with a representative of Nikon in New

---

**2.** Fleming stated that the meeting ran from 9:30 a.m. to 4:00 p.m.

York concerning a possible relationship between Nikon and iView, a transaction for which Miller claims he laid the groundwork during his own contacts with the same Nikon official just months earlier.

Defendants discount the significance of their New York contacts with Miller by also claiming that some consisted of dinners they had together purely as social events. The Court cannot credit these assertions. It is fair to say that Defendants' presence in New York on the occasions of three MacWorld conventions was not entirely for social or leisure purposes, but manifested a purposeful act that contemplated promotion of iView's software and services and establishment and/or strengthening of business relationships in New York essential to the success of the company. *See CutCo*, 806 F.2d at 367 ("[F]ew business discussions can be characterized as entirely social."); *GB Marketing USA, Inc. v. Gerolsteiner Brunnen & Co.*, 782 F.Supp. 763, 770 (W.D.N.Y.1991) (finding "less than credible [defendant's] allegations that its representatives attended the shows solely as spectators and that there were no business discussions between [the parties]"); *Round One Prods., Inc. v. Greg Page Enters., Inc.*, 566 F.Supp. 934, 937–38 (E.D.N.Y.1982) ("Meetings which are partially social in nature, as well as meetings which merely create the likelihood of a more solid business relationship are a sufficient basis for the exercise of in personam jurisdiction"); *American Contract Designers, Inc. v. Cliffside, Inc.*, 458 F.Supp. 735, 739 (S.D.N.Y.1978).

On the record before it, prior to any substantial adversarial discovery, the Court cannot determine definitively the degree to which at these indisputably business settings Defendants in fact engaged in solicitation of business, established new relationships with other companies or otherwise promoted iView's interests sufficiently to generate New York business, and thus cross the statutory transaction of business threshold. At the same time, the Court cannot discount the possibility that Defendants' involvement in any of these business outreach efforts or opportunities could have occurred in the context of trade shows whose underlying purpose is precisely the pursuit of these types of potential commercial transactions and development of longer-term relationships. For the purpose of the instant motion the Court does find pertinent, sufficient and creditable Miller's attestations that during these New York trade conventions he and Defendants jointly promoted iView products and established or advanced business relationships with other entities that may have been important to iView's customer base or industry support links.

### C. *CPLR § 301*

Miller also invokes CPLR § 301 as authority for the Court's exercise of personal jurisdiction over Defendants. That provision permits jurisdiction for all purposes over a defendant who is "doing business" in New York irrespective of and wholly unrelated to the particular transaction or relationship between the parties that gave rise to the claim asserted in the underlying litigation. *See Landoil*, 918 F.2d at 1043; *Hoffritz*, 763 F.2d at 58; *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692, 696 (1982). For these reasons, "[t]he doing business standard is a stringent one...." *In re Ski Train Fire in Kaprun, Aus.*, 230 F.Supp.2d 403, 407 (S.D.N.Y.2002) (internal quotations and citation omitted). To satisfy this standard, a plaintiff must establish that the defendant is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence' in the jurisdiction." *Ball*, 902 F.2d at 198 (citation omitted); *Landoil*, 918

F.2d at 1043 (requiring that the defendant's business contacts and connections with New York must show "continuous, permanent and substantial activity [within the State]"); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 98 (2d Cir.2000). Occasional or casual presence or isolated transactions do not suffice under this test. *See Landoil*, 918 F.2d at 1043; *In re Ski Train Fire*, 230 F.Supp.2d at 407.

Miller contends that Defendants' attendance at the MacWorld conventions and solicitation of business there, their existing business relationships formed in New York with other companies—some with Miller's involvement or through his services—and revenues earned from these activities, as well Defendants' maintenance of an active website accessible in New York, suffice to demonstrate the prerequisites of the CPLR § 301 "doing business" test. Having determined that at this stage of the proceedings Miller has made out a prima facie case for personal jurisdiction under CPLR § 302(a)(1), the Court will not address the alternate test at length. Suffice it to say that the sparse pre-discovery record before the Court is not developed enough to support an informed ruling on the extent to which Defendants' business presence or activities in New York are sufficiently substantial, systematic, continuous, and permanent to satisfy the CPLR § 301 standard. *See, e.g., Wiwa*, 226 F.3d at 98; *Hoffritz*, 763 F.2d at 58.

## D. *DUE PROCESS*

■ Defendants claim that the Court's exercise of jurisdiction over them would violate Constitutional due process standards. The Court finds no merit in this argument. On the record before it at this stage of the proceedings, the Court is persuaded that Defendants have had the requisite "minimal contacts" with New York and that requiring them to litigate this action in New York would not offend "our traditional conception of fair play and substantial justice." *International Shoe*, 326 U.S. at 320, 66 S.Ct. 154. The Court finds, as elaborated above, that Defendants' contacts with New York were sufficient to constitute transaction of business. By these interactions with Miller and other New York entities arising in part out of their relationship with Miller Defendants purposely availed themselves " 'of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Accordingly, the Court concludes that it may proceed to consider this action by virtue of the personal jurisdiction over Defendants conferred by CPLR § 302(a)(1).

## E. *INCONVENIENT FORUM*

■ Alternatively, Defendants contend that the United Kingdom provides an adequate and more appropriate venue to adjudicate the instant dispute and thus urge the Court to dismiss the action under the doctrine of *forum non conveniens*. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71–72 (2d Cir.2001); *Wiwa*, 226 F.3d at 98; *Ilusorio v. Ilusorio–Bildner*, 103 F.Supp.2d 672 (S.D.N.Y.2000), *aff'd*, 2001 U.S.App. LEXIS 17157 (2d Cir. Mar. 23, 2001). Having examined above the facts and arguments presented in connection with the personal jurisdiction issue, the Court is not persuaded that dismissal of this action is warranted on the grounds of the inconvenience of this forum.

First, while the Court acknowledges that the United Kingdom would provide an

adequate forum for this dispute, it finds that under the balance of private and public factors analysis demanded by *Gilbert*, the considerations would not weigh "strongly" in favor of Defendant's proposed foreign jurisdiction. *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839. Defendants allude to non-parties who live in London, but they present no evidence of who those parties are and what material role they played in this litigation that would make their appearance at a trial here essential. Miller, on the other hand points to third parties in Canada, California, New Jersey, Pennsylvania and New York that are among the entities with which Defendants allegedly transacted iView business relevant to this action. The Court cannot accept Defendants' contention that for these firms and individuals there is no substantial difference between appearing at a trial in London and at one in New York. For these persons, New York would surely be more convenient. Moreover, some then would be within the subpoena power of this Court.

Location of records is not a compelling consideration where they can be easily transported. The Court finds nothing before it to suggest that relevant documentation in this case is overwhelmingly in the United Kingdom and cannot be brought to New York without causing Defendants undue burdens. In fact, as Miller noted, much of the pertinent documentation includes communications between the parties carried out by electronic means, copies of which are readily and equally accessible. The Court also discerns no appreciable inconvenience to Defendants to appear for a trial in New York of limited duration no longer than any of the various visits they have already made to attend the MacWorld expos in order to promote their business interests here.

The Court finds the weight of the public factors at best neutral. The alleged New York transactions between the parties and Defendants' business activities targeted to New York provides sufficient local connection and interest for the commercial dispute at bar to be adjudicated here. *Cf. Ismail v. American Univ. of Beirut*, 246 F.Supp.2d 330, 334 (S.D.N.Y.2003); *Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*, 158 F.Supp.2d 377, 387 (S.D.N.Y.2001), *aff'd*, 311 F.3d 488 (2d Cir.2002). The Court is not prepared to make subjective or conclusory comparative assessments of docket congestion here as opposed to London, or of the relative speed with which the matter may be resolved in either venue. Suffice it to say that, with the parties cooperation and good will, the Court can schedule a trial on the merits within a reasonable period following the completion of all discovery or rulings on any dispositive motions. Though Defendants characterize this litigation as one involving the business affairs of an English company that must be governed by English law, choice of law issues have not been fully examined on the record before the Court and, under New York conflict of laws rules, which forum's substantive law will govern this action is by no means a foregone conclusion.

Finally, the Court considers the mandate of *Gilbert* that "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should *rarely* be disturbed." *Gilbert*, 330 U.S. at 508, 67 S.Ct. 839 (emphasis added); *see also Wiwa*, 226 F.3d at 100; *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002); *Iragorri*, 274 F.3d at 71–72. Here, though that Miller is a resident of Hawaii, that consideration does not by itself militate against the deference due to plaintiff's forum choice. The Court finds nothing in the record to suggest that Miller's choice New York forum was motivated by forum-

**430**

shopping, bad faith or other improper strategic purpose. *See Iragorri*, 274 F.3d at 72 ("[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*") Accordingly, based on the preceding considerations, the Court denies Defendants' motion to dismiss this action on the grounds of the inconvenience of Miller's choice of this forum.

## ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the motion of defendants Yannis Calotychos, Victoria Thompson and iView Metromedia Ltd. to dismiss this action for lack of personal jurisdiction or *forum non conveniens* is DENIED; and it is further

**ORDERED** that the stay of discovery previously ordered by the Court limited to the jurisdictional dispute that is the subject of the motion denied herein is lifted; and it is finally

**ORDERED** that the parties confer and submit to the Court by February 18, 2004 a proposed Case Management Plan in the form provided by the Court.

**SO ORDERED.**